BERTHA PEREZ, Special Administratrix of the Estate of
MARCO LOPEZ, and BERTHA PEREZ, Natural
Mother and Guardian of ARIANNY CELESTE LOPEZ,
Appellant, v. LAS VEGAS MEDICAL CENTER, DR.
GREGORY, Respondents.

No. 19905

February 1, 1991

805 P.2d 589

*Eva Garcia,* Las Vegas, for Appellant.

*Alverson, Taylor & Mortensen,* and *Bryan K. Gould,* Las Vegas, for Respondents.

**OPINION**

By the Court, Rose, J.:

This is an appeal from a summary judgment entered against the appellant (hereinafter, Ms. Perez) in a wrongful death action. The district court held that Ms. Perez could not prove that the alleged negligence of the health care provider was the legal cause of the death, because the decedent probably would have died

anyway due to his serious preexisting medical condition. We adopt the "loss of chance" doctrine for medical malpractice cases, and under that doctrine Ms. Perez raised genuine issues of material fact to the district court. Accordingly, we reverse the grant of summary judgment and remand this case for further proceedings.

## FACTS

The pertinent facts submitted by the parties in connection with respondents' motion for summary judgment are as follows. On April 15, 1985, Marco Lopez, a prisoner at the Clark County Detention Center, died of a massive brain hemorrhage, due apparently to an aneurysm or a congenital defect in an artery.

Lopez had been detained and incarcerated on April 3, 1985. Two days later, after he complained that he was ill, Lopez was taken to the Las Vegas Medical Center, which was under contract to treat prisoners from the detention center. From April 5-9, Lopez was confined in the medical ward. During this time physicians made no attempt to diagnose the persistent headaches of which Lopez was complaining. Lopez was returned to jail. On April 15, Lopez was discovered in his cell by a nurse to be having seizures. Although the duty physician, Dr. Gregory, was notified by telephone of the seizures, no examination or treatment other than administration of valium and phenobarbital was given Mr. Lopez. A few hours later, Mr. Lopez was found dead in his cell.

Based on this death, Ms. Perez brought the present lawsuit, alleging wrongful death due to negligence on the part of the responsible medical providers. Dr. Tiholiz, a general practitioner from Los Angeles, testified in a deposition on behalf of Ms. Perez. Dr. Tiholiz stated that Lopez would have had a "reasonable chance" of surviving the hemorrhage if he had been given prompt and proper medical care. Dr. Tiholiz admitted, however, that Lopez probably did not have a greater than fifty percent chance of surviving the hemorrhage, even given proper medical care. Additionally, Carolyn Sabo, a professor of nursing at the University of Nevada Las Vegas, testified in a deposition that, if given proper medical care and diagnosis, Lopez "might" have lived. An expert on behalf of the respondents, however, suggested that Mr. Lopez' chances of surviving such a hemorrhage would be very slight.

Respondents moved for summary judgment against Ms. Perez on the ground that any negligence by health care providers could not have been the legal cause of Lopez' death, since Lopez probably would have died anyway due to his serious preexisting condition. Based on the evidence stated above, the district court

entered summary judgment in favor of respondents. Ms. Perez appeals the order granting summary judgment.

## LEGAL DISCUSSION

The question presented by this appeal is whether the district court erred by granting respondents' motion for summary judgment on appellant's wrongful death claim alleging medical malpractice. "Summary judgment is appropriate only when the moving party is entitled to judgment as a matter of law, and no genuine issue of material fact remains for trial;" properly supported factual allegations of the party opposing summary judgment must be accepted as true. Wiltsie v. Baby Grand Corp., 105 Nev. 291, 292, 774 P.2d 432, 433 (1989). Additionally, the pleadings and documentary evidence must be construed in the light which is most favorable to the party against whom the motion for summary judgment is directed. Mullis v. Nevada National Bank, 98 Nev. 510, 512, 654 P.2d 533, 535 (1982). Litigants are not to be deprived of a trial on the merits if there is the slightest doubt as to the operative facts. *Id.*

First we address the question of respondents' entitlement to judgment as a matter of law. Ms. Perez sued on a negligence theory. To prevail on a negligence theory, the plaintiff generally must show that: (1) the defendant had a duty to exercise due care towards the plaintiff; (2) the defendant breached the duty; (3) the breach was an *actual* cause of the plaintiff's injury; (4) the breach was the *proximate* cause of the injury; and (5) the plaintiff suffered damage. Beauchene v. Synanon Foundation, Inc., 151 Cal.Rptr. 796, 797 (Cal.Ct.App. 1979). In order to establish entitlement to judgment as a matter of law, respondents must negate at least one of the above five elements of the plaintiff's case.

The issue disputed on this appeal is whether Ms. Perez failed, as a matter of law, to establish the existence of actual causation, *i.e.*, that the alleged medical malpractice actually caused the harm complained of. As a general rule in medical malpractice cases, the plaintiff must prove that the alleged negligence more probably than not caused the ultimate injury (rule of proving causation by a preponderance of evidence). *See* Orcutt v. Miller, 95 Nev. 408, 411-12, 595 P.2d 1191, 1193 (1979). Respondents argue that the evidence shows that Mr. Lopez probably would have died anyway due to his serious preexisting physical condition. Therefore, respondents contend, only the preexisting medical ailment, and not the alleged medical malpractice, can be

considered the probable, or preponderant, cause of Lopez' death. In short, respondents contend that Ms. Perez cannot, as a matter of law, establish the element of actual causation according to the traditional preponderance requirement.

The issue of first impression presented by respondents' argument is whether the preponderance requirement for proof of causation operates to bar recovery in medical malpractice cases where there is a fifty percent or greater chance that the patient's underlying ailment caused the death (*i.e.*, where the plaintiff has a fifty-fifty or lower chance of survival due to a serious preexisting medical problem). There are many cases coming down on both sides of this question. *See* Annotation, *Medical Malpractice: "Loss of Chance" Causality*, 54 A.L.R.4th 10 (1987). Applying the traditional preponderance requirement strictly, some courts have held that plaintiffs with fifty-fifty or lower chances of survival due to their original ailment cannot demonstrate that medical malpractice was the actual cause of the death. *See, e.g.*, Gooding v. University Hosp. Bldg., Inc., 445 So.2d 1015 (Fla. 1984). Several other courts have relaxed the traditional preponderance requirement for causation to allow limited recovery under these circumstances. *See, e.g.*, McKellips v. Saint Francis Hosp., Inc., 741 P.2d 467 (Okl. 1987); Herskovits v. Group Health Co-op., 664 P.2d 474 (Wash. 1983).

We conclude that the large line of cases which permits recovery under these circumstances represents the better view. There are many good arguments against applying the preponderance rule of causation strictly to bar recovery in cases such as this. *See especially, Herskovits*, 664 P.2d at 486-87 (Pearson, J., concurring) (quoting King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353 (1981)). Of the various arguments against the position urged by respondents, the following is most fundamental: the respondents' position would bar any recovery in tort on behalf of the survivors of many potentially terminal patients, no matter how blatant the health care provider's negligence. Through negligence, a physician or other health care provider could reduce a patient's chances of survival from as high as fifty percent to, for example, ten percent, and yet remain unanswerable in the law of tort. This position is simply untenable. As the *McKellips* court explains:

> Health care providers should not be given the benefit of the uncertainty created by their own negligent conduct. To hold otherwise would in effect allow care providers to evade liability for their negligent actions or inactions in situations

in which patients would not necessarily have survived or recovered, but still would have a significant chance of survival or recovery.

*McKellips*, 741 P.2d at 474. The disadvantages of the position urged by respondents are both more certain and more severe than any disadvantages of the position we adopt today. Additionally, it is important to recall that no cause of action will lie absent some instance of negligence by the health care provider.

As discussed in *McKellips*, courts have adopted various rationales in order to avoid the harsh and unjustified result just discussed. We conclude that the best rationale supporting recovery in these circumstances is the "loss of chance" doctrine. Under this doctrine, the injury to be redressed by the law is not defined as the death itself, but, rather, as the decreased chance of survival caused by the medical malpractice. *Herskovits*, 664 P.2d at 487 (Pearson, J., concurring); *see also* Note, *Medical Malpractice: The Right to Recover for the Loss of a Chance of Survival*, 12 Pepperdine L. Rev. 973 (1985) (authored by Patricia L. Andel). Of course, the plaintiff or injured person cannot recover merely on the basis of a decreased chance of survival or of avoiding a debilitating illness or injury; the plaintiff must in fact suffer death or debilitating injury before there can be an award of damages. Additionally, the damages are to be discounted to the extent that a preexisting condition likely contributed to the death or serious debilitation. Specifically, "[t]he amount of damages recoverable is equal to the percent of chance [of survival] lost [due to negligence] multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action." *McKellips*, 741 P.2d at 476.

By defining the injury as the loss of chance of survival, the traditional rule of preponderance is fully satisfied. In cases in which the plaintiff prevails, it can be said that the medical malpractice *more probably than not* decreased a substantial chance of survival and that the injured person ultimately died or was severely debilitated. Specifically, in order to create a question of fact regarding causation in these cases, the plaintiff must present evidence tending to show, to a reasonable medical probability, that some negligent act or omission by health care providers reduced a substantial chance of survival given appropriate medical care. In accord with other courts adopting this view, we need not now state exactly how high the chances of survival must be in order to be "substantial." We will address this in the future on a case by case basis. There are limits, however, and we doubt that a ten percent chance of survival as referred to in the example

in the dissenting opinion would be actionable. Survivors of a person who had a truly negligible chance of survival should not be allowed to bring a case fully through trial. Perhaps more importantly, in cases where the chances of survival were modest, plaintiffs will have little monetary incentive to bring a case to trial because damages would be drastically reduced to account for the preexisting condition.

Having addressed the applicable legal standards, we turn now to the question of whether Ms. Perez presented sufficient proof in connection with the motion for summary judgment to create a question of fact on the issue of causation. We conclude that she did. As in *McKellips,* we do not require that the expert testimony specifically quantify the percentage chance of survival in order to create a question of fact on causation; specific percentages are necessary only at later stages in determining the precise measure of damages. *McKellips,* 741 P.2d at 475. In the present case, Dr. Tiholiz testified that Mr. Lopez had a reasonable chance of survival given proper medical attention. We recognize that Mr. Lopez' preexisting condition appears to have been grave indeed and that Dr. Tiholiz's opinion is not particularly strong or specific. Nevertheless, under the summary judgment standards stated above, we must accept this statement as true and, moreover, we must draw all inferences from this statement in a manner which is favorable to the party opposing summary judgment. Interpreted in a manner most favorable to Ms. Perez, Dr. Tiholiz's statement and other deposition testimony fairly imply that, through prompt and proper decompression and other treatment, Mr. Lopez would have had a substantial chance of survival. Because more than a slight doubt remains as to Lopez' chances of survival, Ms. Perez was entitled to bring the issue of causation to trial. Therefore, Ms. Perez succeeded in raising a genuine issue of material fact on the issue of causation pursuant to the loss of chance doctrine and the motion for summary judgment was improvidently granted.

The nature and quality of Mr. Perez' survival is not an issue with which we must concern ourselves at this time. It was not fully explored below and not the basis for the district court's decision. Further, Dr. Tiholiz, the plaintiff's expert, used the term survival without qualification. Giving every reasonable inference to the appellant against whom summary judgment was granted, we conclude that Dr. Tiholiz's unqualified use of the word survival meant survival with a reasonable quality of life. If the respondents felt it was important to explore what Dr. Tiholiz meant by survival, they could have examined further on this point.

The dissent expresses fears that the floodgates of litigation will be opened by this opinion. Nothing of the sort will occur. Rather, the rule will give deserved redress in infrequent situations similar to this case. And by adopting the "loss of chance" doctrine, a health care provider will not be able to avoid responsibility for negligent conduct simply by saying that the patient would have died anyway, when that patient had a reasonable chance to live.

For the reasons stated above in this opinion, the order granting respondents' motion for summary judgment is reversed and the case remanded for further proceedings consistent herewith.

MOWBRAY, C. J., and SPRINGER, J., concur.

STEFFEN, J., with whom YOUNG, J., joins, dissenting:

My review of the record reveals no sound basis for reversal even under the "loss of chance" doctrine prematurely adopted by the majority. I would therefore affirm the order of summary judgment.

### The Facts

A recital of the relevant facts lends context to my analysis. Although this is an appeal from summary judgment, I do not find in the record a basis for reversal based upon a dispute of material facts.

Marco Lopez (Marco) died of a massive brain hemorrhage while in custody at the Clark County Detention Center awaiting trial on cocaine trafficking charges. The hemorrhage was apparently due to a congenital defect in an artery in Marco's brain.

Marco experienced headaches during the period of his confinement from April 3, 1985 until the date of his death on April 15 of the same year. Doctors at the center examined him, but performed no extensive tests and failed to recognize the severity of Marco's condition. Marco eventually convulsed, slowly lapsed into a coma, and died.

Appellant contends that proper medical care, preliminary diagnosis, and subsequent emergency treatment would have given Marco a "reasonable chance of survival." The facts of record indicate that the nature and circumstances of Marco's condition provided very little prospect for his survival irrespective of the quality and extent of any medical measures that were taken or could have been taken. Nevertheless, appellant argues that factual issues remain concerning negligence and causation. In addition, appellant urges her entitlement to further discovery and the benefit of the "loss of chance" or increased risk of harm doctrine in her action against respondents.

Turning to the facts in greater detail, and in a light most favorable to appellant, it is apparent to me why appellant's action against the Las Vegas Medical Center (LVMC) and the treating physician, respondent Maurice Gregory, should fail as a matter of law.

According to appellant, Marco was detained and incarcerated on April 3, 1985. During the booking process, Marco complained that he was ill, but he received no treatment at that time. Two days later, Marco was taken to LVMC after complaining that he was suffering from headaches, stiff neck and a fever, and was too ill to eat. At this time, two different doctors examined Marco and observed that his blood pressure was elevated. One doctor diagnosed his condition as the flu and the other as a cervical strain. It appears that neither diagnosis was made with the benefit of x-rays or a spinal examination to determine the basis for limited neck movement or rotation.

Marco was confined in the medical ward of the center from April 5 to April 9, 1985. During this time his headaches were unrelenting and no attempt, by examination or otherwise, was made to determine their cause. On April 15, Marco was placed on sick call after complaining of headaches, and an officer made a notation that Marco should be watched.

At approximately 4:40 p.m. on April 15, Marco commenced having seizures. Dr. Gregory was informed of this development by telephone and, without examining the sick inmate, ordered that he receive valium and phenolbarbital. Appellant also asserts that Marco began slipping into a coma around 5:30 p.m. but was ignored for another five hours and twenty minutes. Apparently, the duty nurses did nothing for him after administering the anti-seizure medication and even failed to regularly take his vital signs. At some point around 11:00 p.m. that evening, Dr. Gregory was summoned and, after examining Marco, pronounced him dead.

Dr. Henry Soloway performed the autopsy and determined that Marco expired from a massive intercerebral hemorrhaging that in his opinion was caused by either an aneurysm or a congenital arteriovenous malformation.[1]

One of appellant's experts, Carolyn Sabo, a professor of nursing at the University of Nevada at Las Vegas, testified by deposition that LVMC's nursing staff had improperly recorded Marco's

---

[1]Dr. Soloway's diagnosis was disputed by experts representing both appellant and respondents. Appellant's experts contended that the post mortem findings included no description of an aneurysm. Respondents' expert had similar reservations and stated that evidence of either of Dr. Soloway's findings would have been palpable if a rupture had occurred in accordance with Dr. Soloway's surmise.

vital signs and that absent that dereliction Marco might still be alive. However, Professor Sabo admitted that she was not qualified to express an opinion concerning the effectiveness of surgical intervention in saving Marco's life.

Appellant's other expert, Dr. Ivan Tiholiz, opined in his deposition that the medical attention and care provided to Marco were negligent and below the appropriate standard of care. Dr. Tiholiz also testified that Marco might have lived if he had received proper medical treatment, including decompression. However, Dr. Tiholiz admitted that even if Marco had received medical attention of acceptable quality, it was more likely than not that Marco's hemorrhage would have been fatal.[2]

Respondents' expert, Dr. Richard Lewin, a neurosurgeon, testified by deposition that surgical intervention could not have prevented Marco's death, and that even if Marco had a one percent chance of survival, which he doubted, survival would have meant life on a respirator or as a quadriplegic.

The district court entered summary judgment in favor of respondents on the ground that appellant could not prove that the alleged negligence caused Marco's death.

### Discussion

In Orcutt v. Miller, 95 Nev. 408, 595 P.2d 1191 (1979), we held that in order for a plaintiff to avoid summary judgment in an action based upon medical malpractice, the plaintiff must establish:

> (1) the accepted standard of medical care or practice, (2) that the doctor's conduct departed from the standard, and (3) that his [the doctor's] conduct was the legal cause of the injuries suffered (citations omitted).

*Id.* at 411, 595 P.2d at 1193.

We further held in *Orcutt* that an expert's statement that the negligent medical treatment complained of "probably" precipitated the ultimate condition was enough to raise a genuine issue of material fact for trial. *Id.* at 412, 595 P.2d at 1193. Under this standard, even if the standard of care was established, and even if the care and monitoring Marco received fell below that standard

---

[2]When asked if Marco's chance of survival was better than fifty percent given his condition, Dr. Tiholiz stated that he probably did not have that high of a chance. Although appellant claims that the doctor later indicated that Marco's chance of survival would not be less than fifty percent either, I have reviewed the doctor's depositional testimony of record, and cannot agree with appellant's contention. Moreover, Dr. Tiholiz did not voice an opinion as to what he meant by the term "survival."

of care, I do not believe that the final requirement, that of legal causation, can be shown.

Appellant asserts that her expert's testimony that Marco had a "reasonable chance of survival" is equivalent to or stronger than the "probably precipitated" expert testimony in *Orcutt* upon which this court reversed summary judgment. However, appellant's expert's testimony, when examined in context, indicates that the undefined, "reasonable chance of survival," falls short of the threshold showing necessary to raise the asserted chance of survival to an issue which may properly be submitted to a jury.

Dr. Tiholiz testified that with proper non-negligent medical treatment and decompression, Marco *might* have lived. However, he also testified that even with proper medical attention, *more likely than not,* Marco's hemorrhage would have been fatal. Upon further questioning, he also testified that Marco *had less than a fifty percent chance of survival.*

Respondents' expert opined that there was less than a one percent chance of survival, given Marco's congenital condition, and then qualified "survival" to mean living as a quadriplegic or while continually sustained by a respirator. Thus, there was an apparent agreement among the experts that whatever Marco's chances of survival, they were less than fifty percent.

The majority, focusing on testimony indicating that Marco was deprived of an undefined chance of survival because of inadequate medical care, seize the moment to adopt the "loss of chance" doctrine. I suggest that the majority's ruling is both premature and inapplicable to the instant case.

Concededly, the record reflects sufficient evidence to avoid summary judgment on the issue of professional negligence. Causation, however, when analyzed in connection with the real injury, is not supported in the record. The entire thrust of the majority opinion is that the decedent, Marco, was deprived of some prospect of surviving his affliction by the negligence of the health care providers. Unfortunately, the majority ignores the state of the record concerning the nature and meaning of the survivability value, the attainment of which was assertedly attenuated by respondents' negligence.

The uncontroverted evidence reveals that the prospect of "survival" to Marco meant nothing more than continued life on a respirator or as a quadriplegic. I strongly suggest that the loss of any chances for such a survival, whether one percent or fifty percent, hardly supports a legally cognizable cause of action. Obviously, where survivability itself has little or no value, the loss of a chance to survive has even less value. In any event, I suggest that the majority rule is doubly bad in the instant case. On

the record, Marco had less than a fifty percent chance of survival irrespective of the quality of his medical care, and his chances for a meaningful survival were virtually non-existent. If doctors are to be subjected to liability under such circumstances because of the majority's loss of chance doctrine, how many fewer physicians will be willing to treat patients who have poor survivability or quality of survivability prognoses? To pose the question suggests the answer. Physicians, who have in many instances altered the nature and extent of their practices because of the mounting costs and personal trauma associated with maintaining medical negligence coverage and defending lawsuits that far too frequently are lacking in merit, will have little or no incentive to place their careers at risk under such tenuous prospects for successful treatment.

I suggest that the judiciary has a serious obligation to consider the law and economics aspects of its rulings. Moreover, I am also of the opinion that unless the judiciary maintains a responsible level of human exposure under the tort system, our lawyers of tomorrow will not have the opportunity to seek justifiable redress for clients under a legal system comparable to that which presently exists. Today's ruling exposes medical practitioners to incremental liability for negligently lessening the chance of a patient (who, at best has less than a fifty percent chance of survival) to survive without considering the meaning of survival as it relates to the specific patient. This is precisely why, in my opinion, the majority has prematurely and without an adequate factual foundation, adopted the loss of chance doctrine.

Based upon the record before this court, there is no showing that respondents did anything to lessen the decedent's chances for a meaningful survival. From a vantage point according favor to appellant's position, it could be said that a factual issue exists as to whether respondents' actions or omissions created an added risk to Marco's chances of surviving his condition. It is to be emphasized that the respondents did nothing to create Marco's condition. However, the factual basis for an argument exists that respondents' inattention or negligent failure to properly diagnose Marco's condition increased his risk of non-survival. That fact is the predicate for the majority's ruling. The majority maintains that respondents may be held liable for decreasing Marco's changes of surviving his condition.

If we were faced with a proper case involving the issue addressed by the majority, there could perhaps be a persuasive argument made for adopting the loss of chance doctrine in certain cases of professional negligence. In the instant case, however, the majority is subjecting respondents to the expense and trauma of a trial when the record provides no basis for concluding that

respondents' conduct had any causal relationship or effect on Marco's prospects for a meaningful survival. In that regard, I emphasize again that appellant's expert opined that even the presence of proper medical attention would have been, more likely than not, ineffective in preventing Marco's death; and the expert also failed to define the quality of Marco's existence if he had survived his condition. Thus, the neurosurgeon's conclusion that Marco's one percent chance of survival meant survival on a respirator or as a quadriplegic stands unrebutted and unchallenged. Surely we may assume that if appellant had obtained medical evidence controverting the neurosurgeon's prognosis concerning the nature of Marco's unlikely survival, she would have presented it to the district court.

On the record, then, the majority concludes that respondents may be held liable for decreasing Marco's chance to survive as a quadriplegic or on a respirator. I do not believe that an extension of liability to such lengths is justified. Moreover, I fear that the majority ruling will add impetus to organized efforts on the part of the medical profession and insurance industry to restructure the tort system or otherwise limit the prospects or amount of relief available to parties truly and provably aggrieved by acts of medical negligence.

Having expounded the reasons why I believe the majority has both prematurely adopted the loss of chance doctrine and arrived at the wrong result under the application of that doctrine, I turn now to the reasoning of the majority opinion and suggest that an analysis of the majority's logic illustrates additional concerns regarding the conclusions reached.

In adopting the "loss of chance" doctrine, the majority asserts that "the injury to be redressed by the law is not defined as the death itself, but, rather, as the decreased chance of survival caused by the medical malpractice." In terms of causation, the majority now holds that causation regarding the ultimate injury, in this instance, death, is not an element of the cause of action. Rather, the issue is whether it can be shown by a preponderance of the evidence that a health care provider's negligence decreased the patient's chance to survive. If expert medical evidence revealed that a patient's chance of surviving his or her condition was, for example, ten percent, then the health care provider could be held liable for negligently reducing the survival prospects from ten to four percent. The fact that the patient had a ninety percent chance of succumbing to his or her affliction has no relevance under the majority's rule. Under the facts of this case, an abandonment of the need to show a causal nexus between negligence and injury before liability can be imposed represents a worrisome departure from established tort law basing liability

upon a negligent breach of duty which is the proximate cause of the injury. It is analogous to imposing liability for injury resulting from a collision where the defendant's only act of negligence was in forgetting to carry his driver's permit. In other words, if the patient's condition was such that he would have had only a ten percent chance of surviving under the best of medical care, that fact would neither be a required element of proof or even a relevant consideration under the majority's ruling. Under such circumstances, the fact that the physician's negligence reduced the theoretical ten percent chance of survival, but otherwise had no causal effect on the patient's demise would have no bearing on the plaintiff's right to recover.

The majority seeks to buttress its ruling with a sop, stating that "[o]f course, the plaintiff or injured person cannot recover merely on the basis of a decreased chance of survival or of avoiding a debilitating illness or injury; the plaintiff must in fact suffer death or debilitating injury before there can be an award of damages." Obviously, if the patient suffers no injury, there could be no basis for damages. The problem, however, is that if death or injury results, the majority rule does not concern itself with the issue of whether the defendant physician's conduct caused or contributed to the death or injury. The basis for liability is a composite of negligence and a resultant reduction in the chance to avoid death or injury.

The majority rule produces a formula for determining damages which, in my view, is both inconsistent and highly speculative. If a patient suffers death or injury, the prospects for which have been increased by medical negligence, the majority rule provides that "the damages are to be discounted to the extent that a preexisting condition likely contributed to the death or serious debilitation. Specifically, '[t]he amount of damages recoverable is equal to the percent of chance [of survival] lost [due to negligence] multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action.'" (Quoting McKellips v. Saint Francis Hosp., Inc., 741 P.2d 467, 476 (Okl. 1987)). Using the hypothetical posed above, if the patient had a ten percent chance of survival reduced to four percent by a physician's negligence, and if the patient had a sizable earnings history and surviving loved ones, total damages based upon those ordinarily allowed in wrongful death actions would amount, hypothetically, to $1,000,000.00. The formula would then multiply the total damage figure by six percent, which would be the percentage by which the patient's chance of survival had been reduced by the defendant's negligence. The resultant damages imposed on the defendant physician would be $60,000.00. This

result is inconsistent with traditional tort concepts, because there may be no causal relationship at all between the physician's negligence and the patient's death. It would in fact be true under the preceding hypothetical that there was a ninety-four percent probability that the physician's negligence had no more to do with the patient's death than the failure of a defendant driver to have his driver's permit available at the scene of a collision where injuries occurred without any causative negligence on the defendant's part. Moreover, the majority formula is unsound in that it fails to differentiate between the value of a chance for surviving under circumstances of a complete recovery and the value of a chance for survival as a ventilator-dependent quadriplegic. Marco began his incarceration in possession of all his faculties, and the majority formula would apparently subject respondents to a fraction of damages "ordinarily allowed in a wrongful death action" without regard or allowance for the fact that survival for Marco did not include prospects for a complete or substantial recovery. If, in fact, the majority had recognized the great disparity in the meaning of survival with full recovery and survival of the nature and quality facing Marco (assuming, of course, he *could* have survived), it should be evident why an affirmance of summary judgment in this case would be appropriate.

The majority concludes that "[b]y defining the injury as the loss of chance of survival, the traditional rule of preponderance is fully satisfied." I suggest that the rule concerning proof of causation by a preponderance of the evidence is no more satisfied by the majority's redefinition of "injury" than it would be if the majority had arbitrarily decided to equate negligence with injury, thus allowing recovery for negligence in the abstract. As the court held in Cooper v. Sisters of Charity of Cincinnati, Inc., 272 N.E.2d 97, 102 (Ohio 1971), "[l]oss of chance of recovery, standing alone, is not an injury from which damages will flow." Moreover, under Nevada's wrongful death statute, NRS 41.085, the basis for a wrongful death claim is negligence or wrongful acts that *cause the death* of the decedent. There is no latitude in the statute for shifting the basis for damages from conduct causing death to conduct lessening the prospects for survival.

Particularly troubling, I suggest, is the majority's determination that in the future, definitions of "a substantial chance of survival" will be determined *by this court on appeal,* on a case by case basis. The majority seemingly would permit an action to go forward under evidence of the slightest chance of survival on the theory that "in cases where the chances of survival are truly minimal, plaintiffs will have little monetary incentive to bring a case to trial, because damages would be drastically reduced to account for the preexisting condition."

In the first place, I find it difficult to believe that any form of judicial system would subject parties to a trial with no direction as to whether a minimum legal threshold of survivability exists on the evidence until this court decides the issue on appeal. This type of case by case, after the fact screening on appeal is not only a source of manufactured judicial inefficiency, it subjects physicians to a most tortured form of procedure before reaching a basis for finality. Secondly, to assume that the prospect of minimal damages would act as a deterrent to the filing of lawsuits involving minimal chances of survival is, I believe, unrealistic. I suggest that one of the most unfortunate and vexing aspects of medical malpractice litigation today is the fact that too many attorneys who are unqualified to handle such complex cases are subjecting physicians to hellish litigation that has little or no merit. Too often, such attorneys proceed on the assumption that at the very least they will extract nuisance or harassment value damages from the beleaguered physician. I suggest that the majority rule will provide incentive for a proliferation of these types of suits because now it will not have to be shown that the physician's actions had any causative effect on the ultimate injury or death of the patient.

Finally, the majority have *sub silentio* adopted the premise that any showing of a chance of survivability, *irrespective of the meaning or quality of the survival prospect,* will support a cause of action against a physician whose conduct may have reduced the patient's chances of survival. As mentioned previously, and emphasized again, such a ruling will predictably elicit a reaction from the medical community either by way of significant numbers of refusals to treat patients in such potential categories or a major effort to change or limit the existing tort system as it applies to the area of medical negligence.

If evidence had been presented supporting the proposition that medical negligence deprived Marco of a demonstrably significant chance for a meaningful recovery, then summary judgment would have been improper. In my opinion, however, appellant has not carried her burden under *Orcutt* or even shown that the respondents increased the risk of harm to which Marco's condition subjected him and which eventually caused his death. The size and force of the rupture suffered by Marco raises serious doubts concerning his ability to survive despite respondents' efforts or lack thereof. I suggest, therefore, that the instant case is an inappropriate precedent for determining the extent to which survival expectancies must be demonstrated in future cases; here, no legally contemplated standard of sufficiency would be satisfied by the evidence.

Moreover, at least until this court reviews an appropriate case for seriously considering adoption of a carefully defined loss of chance doctrine, I find the view persuasive that "in order to comport with the standard of proof of proximate cause, plaintiff in a malpractice case must prove that defendant's negligence, *in probability,* proximately caused the death." *Cooper,* 272 N.E.2d at 103.[3]

For the reasons noted above, I am convinced that appellant's contentions lack merit. Accordingly, I would affirm the summary judgment entered by the district court.

---

[3]It would appear to me that if the majority's loss of chance doctrine is just in the context of a medical malpractice action, it would be equally just and applicable in such actions involving other professions, including the legal profession. For example, if a disgruntled or unsuccessful litigant loses a case, and it could be shown through expert testimony that there was a forty percent chance of winning the case, but the lawyer's negligent efforts reduced the chance of winning by some degree, the litigant would be able to pursue an action based upon the loss of chance doctrine adopted by the majority. Under the majority view, the "injury" would be the loss of chance as opposed to the unfavorable verdict.