R. D. PRABHU, M.D., Appellant, v. LINDA RANDOLPH LEVINE, now LINDA WEBER aka LINDA FRANCO, Respondent.

No. 21270

June 24, 1993

855 P.2d 543

*Miles Pico & Mitchell* and *James R. Rosenberger,* Las Vegas, for Appellant.

*Daniel Marks,* Las Vegas, for Respondent.

*Hamilton & Lynch,* Reno, for Amicus Curiae NTLA.

## OPINION

*Per Curiam:*
Linda Randolph Levine Weber Franco (Ms. Franco) suffered

facial paralysis, hearing loss, and other injuries as a result of the surgical removal of an acoustic neuroma, a benign brain tumor that grows from the eighth cranial nerve in the left posterior region of the cranium. Ms. Franco alleged at trial that if appellant, Dr. R. D. Prabhu (Dr. Prabhu), had diagnosed the tumor when she first complained to him of her symptoms, she would not have suffered permanent damage. Ms. Franco asserts that Dr. Prabhu's failure to find the tumor increased the risk of harm from the tumor. A jury awarded Ms. Franco $1,331,900, which was reduced by forty percent due to Ms. Franco's comparative negligence. Although we are extremely sympathetic to Ms. Franco's plight, we conclude that the evidence was not sufficient to support a finding that the failure to diagnose Ms. Franco's tumor was the actual or proximate cause of her injuries or that it increased the risk that the tumor would cause permanent damage, and accordingly, we must reverse the judgment of the trial court.

## Facts

Ms. Franco was a registered nurse who worked at Valley Hospital in Las Vegas, the same hospital where Dr. Prabhu worked. Ms. Franco first sought treatment from Dr. Prabhu on February 19, 1982. She complained of weakness, fatigue, dizziness, light-headedness, palpitations, occasional headaches, and of instances where she almost lost or did lose consciousness. Based on the initial consultation, Dr. Prabhu's differential diagnoses were: mitral valve prolapse, cardiac arrhythmia, hypoglycemia, or hyperthyroidism. Dr. Prabhu admitted Ms. Franco to Valley Hospital for two days of diagnostic testing on February 23 through February 25, 1982. Dr. Prabhu characterized the testing as a complete workup. However, Ms. Franco asserts that Dr. Prabhu should have, but failed to, order any type of neurological investigation.

Dr. Prabhu testified that he conducted his own neurological investigation by examining her eyes, glands, and membranes, and he found no signs of neurological disorder that would warrant further testing. Dr. Prabhu also testified that Ms. Franco did not report any signs or symptoms of acoustic neuroma, or any other neurological dysfunction, such as vision changes or hearing impairment. Therefore, he believed further neurological testing was unnecessary. However, Ms. Franco reported on the hospital admissions sheet that her vision was blurred at a distance and that she had occasional ear pain and hearing difficulties.

Dr. Prabhu found no origin for Ms. Franco's problem and diagnosed it as vasovagal attacks due to low blood pressure. Ms. Franco testified that Dr. Prabhu told her all her tests were normal and that she should reduce her caffeine intake. Dr. Prabhu testi-

fied that he told her to return if the symptoms worsened, and that he suggested she see an ear, nose, and throat (ENT) specialist because he had identified a sinus problem. Ms. Franco, on the other hand, testified that Dr. Prabhu never suggested she see another physician and, after his initial diagnosis, he never followed up on her condition. She did see an ENT specialist, Dr. George M. Hemmeter, who recommended she have an X-ray study of her inner ear, which was never done.

Over the following year, Ms. Franco's symptoms became progressively worse, and she suffered some hearing loss. In July of 1983, she saw a neurologist, Dr. Gerald Dunn (Dr. Dunn), who performed a CAT scan and diagnosed the acoustic neuroma. He referred her to a neurosurgeon, Dr. Franco Erculei (Dr. Erculei), who performed four surgeries during July and August of 1983 to remove the tumor.

After the surgeries, Franco could not walk, sit up, feed, or bathe herself for three months. The surgeries left her with seventh and eighth cranial nerve damage, which resulted in facial palsy and hearing loss. Significantly, Ms. Franco could not close her left eye. She treated with two ophthalmologists in Las Vegas following the surgeries. From October of 1984 to May of 1986, Dr. Robert Levine (Dr. Levine), a Los Angeles ophthalmologist, performed five additional surgeries so that Franco's eye could function. These surgeries included installing a spring to open and close the eyelid, a cornea transplant, and two laser surgeries.

Ms. Franco asserts the evidence showed that a reasonably competent doctor would have discovered the tumor when she contacted Dr. Prabhu in February of 1982. At trial, Franco called three doctors as expert witnesses, and Dr. Prabhu called four, including himself. Dr. Levine testified that, based upon his review of Dr. Prabhu's records, Dr. Prabhu breached the standard of care because he should have found the tumor. Conversely, both Dr. Dunn, who found the tumor, and Dr. David Freeman, a neurosurgeon retained as an expert by Dr. Prabhu, testified that Dr. Prabhu did not breach the standard of care. Both Dr. Levine and Dr. Freeman testified that if Dr. Prabhu had done a CAT scan, he would have found the tumor. However, whether or not Dr. Prabhu should have done a CAT scan was disputed.

Dr. Erculei testified that the tumor removed from Ms. Franco's cranium was about 3.5 centimeters in diameter. The experts agreed that this was a medium-sized tumor, since a tumor of less than 2.0 centimeters is considered small, and a tumor greater than 4.0 centimeters is considered large. Dr. Levine, who specializes in helping patients recover from acoustic neuromas, testified that generally the larger the tumor, the greater the damage will be upon removal. He stated that if the tumor had

been small, Franco probably would have had less facial paralysis and would not have needed the additional eye surgeries.

No doctor could give an opinion as to the probable size of the tumor in February, 1982. However, the experts generally agreed that tumors grow at different rates, and that the tumor may have been smaller in February, 1982. Dr. Erculei testified that "the tumor probably was slightly smaller than at the time of surgery." Dr. Levine testified, "I have no way of knowing how large the tumor was at the time of the first date that you mentioned, compared to the measurements that we have at the second date." Dr. Levine also testified that patients with small tumors generally did not require further eye surgeries after removal of the tumor. To the contrary, Dr. Erculei testified that Franco probably would have sustained the same damage to the cranial nerves even if the surgery had been performed in February, 1982.

The jury trial began on April 3, 1990. On April 7, 1990, the jury returned a verdict for Franco, awarding her $14,500 in medical expenses, $17,400 in loss of earnings, $400,000 in past pain and suffering, and $900,000 in future pain and suffering. The judgment was reduced by forty percent in accord with the jury's finding of Franco's comparative negligence. The final award was $798,600 plus interest, for a total judgment of $950,000.

On appeal, Dr. Prabhu argues that: (1) Ms. Franco did not present sufficient evidence of causation; (2) two of the jury instructions were contradictory and therefore confused the jury; (3) Dr. Levine's testimony regarding matters other than his treatment of Ms. Franco should have been excluded as he was not designated as an expert witness; (4) the court erred in admitting a pamphlet and a chapter of a textbook written by Dr. Levine, as they were inflammatory and prejudicial; and (5) the amount of damages awarded shocks the conscience. Because we conclude that the evidence was not sufficient to support a finding of causation that the failure to diagnose Ms. Franco's tumor increased the risk that the tumor would cause permanent damage, we need not address the other issues raised on appeal.

## Discussion

Ms. Franco's complaint alleged that Dr. Prabhu's failure to diagnose her tumor in February of 1982 was negligent. She argues that a reasonably competent medical practitioner would have either done neurological testing or obtained a neurological consultation which would have revealed the tumor in February of 1982. Ms. Franco asserts that Dr. Prabhu's negligence decreased her chance of recovery from the brain tumor, or phrased differently, increased the risk of harm from the tumor.

The general principles which ordinarily govern in negligence cases also apply to medical malpractice claims under Nevada law. To prevail in a medical malpractice action, the plaintiff must establish: (1) the accepted standard of medical care or practice, (2) that the doctor's conduct departed from the standard, (3) that the doctor's conduct was both the actual and proximate cause of the plaintiff's injury, and (4) that the plaintiff suffered damage. Perez v. Las Vegas Medical Center, 107 Nev. 1, 4, 805 P.2d 589, 590-91 (1991); Orcutt v. Miller, 95 Nev. 408, 411-412, 595 P.2d 1191, 1193 (1979). Each of the above elements must be established before a defendant will be found liable for medical malpractice.

The question presented by this appeal is whether Ms. Franco established the existence of actual causation as a matter of law, i.e. that the alleged medical malpractice was the actual and proximate cause of the harm Ms. Franco complains of. It is not enough that the plaintiff merely proves a breach in the applicable standard of care. To prevail in a medical malpractice action, the plaintiff must also prove that the alleged negligence *more probably than not* caused the ultimate injury. *Perez,* 107 Nev. at 4, 805 P.2d at 591. This burden of proving causation by a preponderance of the evidence is the same under the loss of chance doctrine as it is under a traditional medical negligence theory. *Id.* at 6, 805 P.2d at 592. In *Perez* we summarized the loss of chance doctrine as follows:

> By defining the injury as the loss of chance of survival, the traditional rule of preponderance is fully satisfied. In cases in which the plaintiff prevails, it can be said that the medical malpractice *more probably than not* decreased a substantial chance of survival and that the injured person ultimately died or was severely debilitated. Specifically, in order to create a question of fact regarding causation in these cases, the plaintiff must present evidence tending to show, to a reasonable medical probability, that some negligent act or omission by health care providers reduced a substantial chance of survival given appropriate medical care.

*Id.*

Our discussion in *Perez* was subsequent to the trial in this case, and Ms. Franco did not try her case on the "loss of chance" theory. Ms. Franco argues that in *Perez* we adopted a lesser standard of proof of causation in cases where the loss of chance

doctrine applies. This argument confuses causation with the actual loss sustained. This court's adoption of the loss of chance doctrine in *Perez* did not change Nevada law on causation. The significant change in *Perez* was that it recognized that a certain kind of harm (the loss of a substantial chance of survival) could be actionable. A cause of action based on a loss of chance of survival can now be brought and damages awarded. After *Perez,* the plaintiff's burden of proving causation by a preponderance of the evidence is not lessened, but a plaintiff may now recover damages for the loss of a substantial chance to survive or avoid debilitating injury if causation is proven.

Ms. Franco did not contend that the negligence of Dr. Prabhu caused her to develop the tumor which harmed her. Rather, Ms. Franco sought to prove that the negligence of Dr. Prabhu caused her additional unnecessary surgeries and permanent injuries and reduced her chance of recovery from the tumor. To prove her medical malpractice claim, Ms. Franco must show that the medical malpractice more probably than not caused her additional injury or decreased her chance for a better recovery.

Dr. Prabhu contends that the expert medical testimony introduced in support of Ms. Franco's claim was insufficient to prove a causal connection between the allegedly negligent failure to diagnose and Ms. Franco's resulting injury. The central inquiry is whether the plaintiff presented competent expert testimony that tended to show, *to a reasonable medical probability,* that some negligent act or omission by the doctor caused the complained of harm or reduced a substantial chance for a more favorable recovery. *Id; see also* NRS 41A.100(1).[1]

*Medical Testimony Regarding the Standard of Care*

It is well established that in a medical malpractice case, expert medical testimony must be used to establish the accepted standard of care and to establish any alleged deviation from that standard. *See* NRS 41A.100(1). At trial, Ms. Franco presented testimony from Dr. Scott Deppe, Dr. Erculei, and Dr. Levine. Dr. Deppe

---

[1]NRS 41A.100(1) provides, in pertinent part:

Liability for personal injury or death is not imposed upon any provider of medical care based on alleged negligence in the performance of that care unless evidence consisting of expert medical testimony, material from recognized medical texts or treatises or the regulations of the licensed medical facility wherein the alleged negligence occurred is presented to demonstrate the alleged deviation from the accepted standard of care in the specific circumstances . . . .

was a retained expert who testified as to the standard of care. Dr. Deppe's two criticisms of Dr. Prabhu were that he failed to perform a neurological examination of Ms. Franco and that he failed to consider any further neurological workup. Dr. Deppe testified that Dr. Prabhu violated the applicable standard of care by his negligence. Dr. Levine also testified that Dr. Prabhu violated the standard of care. Conversely, both Dr. Dunn, who found the tumor, and Dr. David Freeman, a neurosurgeon retained as an expert by Dr. Prabhu, testified that Dr. Prabhu did not breach the standard of care. That there was conflicting evidence does not negate the fact that Ms. Franco met her burden of proof with respect to the first two elements of a medical malpractice cause of action: the standard of care and a breach of that standard. The fact finder is entitled to weigh the testimony of the experts and decide the credibility of each opinion. *See* Robinson v. G.G.C., Inc., 107 Nev. 135, 143, 808 P.2d 522, 527 (1991). We conclude that Ms. Franco met her burden of proof with respect to putting forth evidence to show a breach in the standard of care.

### Medical Testimony Regarding Causation

Expert medical testimony is also necessary to prove the element of causation in a medical malpractice case. Perez v. Las Vegas Medical Center, 107 Nev. 1, 6, 805 P.2d 589, 592 (1991); *see also* NRS 41A.100(1). Ms. Franco presented testimony regarding causation through Dr. Erculei and Dr. Levine. Dr. Erculei was one of Ms. Franco's treating physicians, the neurosurgeon who removed the tumor. Dr. Erculei testified that acoustic neuromas are slow growing intercranial tumors, and most significantly, testified that the resulting facial paralysis and hearing loss that Ms. Franco sustained probably would have been the same even if the surgery had been undertaken in 1982. Dr. Levine, the surgeon who performed the eye surgeries on Ms. Franco, testified as follows:

> Q  Doctor do you have an opinion as to whether if this tumor was diagnosed in February, 1982, rather than July of 1983, it is more likely than not that the eye surgeries that you had to perform would not have been necessary.
>
> . . . .
>
> A  All right. I have no way of knowing how large the tumor was at the time of the first date that you mentioned, compared to the measurements that we have at the second date. We know that in general tumors grow over time, symptomatology increases over time and from the informa-

tion we have already reviewed, which essentially says that if someone is found to have a tumor, they're better off having a little tumor than a big tumor, then ideally it would have been preferable for this patient to have her tumor diagnosed at the earliest possible time.

Q   Can you say to a degree of medical probability that if the tumor had been diagnosed as a small tumor, rather than a medium tumor, there would have been less necessity for further eye surgeries?

A   Well, I think that is clear from the date [sic] we have reviewed in the article, as well as my subsequent clinical experience, which is that patients with small tumors often have no facial paralysis at all and that [they] generally do very well. And so [had she] been diagnosed at a point where she had only a small tumor, she would have most likely had much less problem of all the types we have talked about, concerning the eye.

. . . .

Q   Do you have an opinion if the tumor was diagnosed as a small tumor, whether or not it's more likely than not that she would have needed any eye surgeries after its removal?

. . . .

A   Well, I have no basis for telling you exactly what would have happened with any given patient, with any hypothetical series of circumstances such as if this patient had an earlier diagnosis. . . .

. . . .

. . . I can tell you, however, that I have had only rare occasion to have to do a surgical procedure on any patient with a tumor two centimeters or less. And, that was evidenced in the article data that we have already reviewed and borne out by subsequent clinical experience.

Dr. Prabhu contends that Ms. Franco did not establish the element of causation. He asserts that Dr. Levine only testified to a *possibility* that Dr. Prabhu's negligence caused the harm and that this is insufficient. We agree. No expert witness could say to a reasonable degree of medical probability that if the tumor had been properly diagnosed by Dr. Prabhu in February of 1982, it would have been small enough to remove without damage, or with less damage, to Ms. Franco. This lack of expert testimony is fatal to Ms. Franco's malpractice claim.

Although Ms. Franco's objective symptomatology worsened from the time of her initial visit to Dr. Prabhu and the discovery of the tumor, which would indicate tumor growth, the medical experts all testified that they did not know how large the tumor was in February of 1982. Ms. Franco contends this is due to Dr.

Prabhu's negligence in failing to order a CAT scan. However, two of the doctors testified that, based on Dr. Prabhu's records, Dr. Prabhu had no data that made a CAT scan necessary, and therefore his failure to order one was not below the standard of care. Dr. Levine stated that *if* the tumor had been small, Ms. Franco *probably* would have had less facial paralysis and would not have needed the additional eye surgeries. He testified that generally the larger the tumor, the greater the damage will be upon removal. However likely, generalities are not sufficient to find causation in a medical malpractice case.

The mere possibility that a defendant's conduct may have caused the injury or loss of chance does not provide sufficient causation as a basis for liability. The plaintiff has the burden of introducing evidence which forms a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. When the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced, you must find for the defendant. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 41, at 269 (5th ed. 1984).

We conclude that the evidence presented at trial was not sufficient to show, to a reasonable medical probability, that Ms. Franco's injuries were caused by Dr. Prabhu's failure to diagnose her brain tumor in February of 1982. Accordingly, for the reasons discussed above, we must reverse the judgment of the district court.[2]

ROSE, C. J., STEFFEN and YOUNG, JJ., and BREEN, D. J.,[3] concurs.

---

[2]THE HONORABLE MIRIAM SHEARING, Justice, did not participate in the decision of this appeal.

[3]The Honorable Peter I. Breen, Judge of the Second Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE CHARLES E. SPRINGER, Justice. Nev. Const., art. 6, § 4.