Keith L. PRESCOTT, Plaintiff,

v.

UNITED STATES of America, Defendant.

And All Consolidated Cases.

No. CV–S–80–143–PMP (LRL).

United States District Court,
D. Nevada.

July 19, 1994.

Dale Haralson, Tucson, AZ, Alan R. Johns, Larry C. Johns, Las Vegas, NV, Stewart L. Udall, Santa Fe, NM, for plaintiff.

James G. Touhey, Jr., Mary Jo Donahue and Bertha R. Mitrani, Trial Attys., Ralph H. Johnson and Leon B. Taranto, Sp. Attys., Torts Branch, U.S. Dept. of Justice, Washington, DC, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRO, District Judge.

### I.

### PRELIMINARY STATEMENT

These consolidated actions arise from the United States' alleged negligence in protecting workers engaged in atmospheric and underground nuclear testing at the Nevada Test Site ("NTS") between January 1951 and February 1981. Plaintiffs allege jurisdiction pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 1402(b), 2401(b) and 2671–2680 (1988).

The Plaintiffs in these fifteen consolidated cases are 216 former NTS workers, or the surviving family members or personal representatives of deceased NTS workers, who allegedly contracted various diseases as a result of occupational exposure to ionizing radiation during their employment at the NTS.[1]

On February 14, 1990, Plaintiff Keith Prescott's case and five wrongful death actions brought by the surviving family members of deceased NTS workers, Joe Carter, Harry J. Giesler, Eugene D. Haynes, Hugh Mosley, and Calvin L. Tuck were selected as representative cases for trial (# 230). Following

the reassignment of these cases, on June 3, 1993, the undersigned confirmed the designation of the six representatives cases (# 339). Trial commenced before the Court sitting without a jury on December 13, 1993, and was completed on February 1, 1994. Having considered the evidence adduced at trial and the extensive post trial briefs filed by the parties, the Court hereby enters its Findings of Fact and Conclusions of Law.

Plaintiff Julia Carter is the widow of Joe Carter, decedent, (Case No. CV–S–81–594–PMP). Joe Carter was born in 1919, and was employed by Reynolds Electrical Engineering Company ("REECo") as a laborer at the NTS from February 1952 to June 1952; from February 6, 1953, to June 10, 1953; from March 29, 1954, to June 27, 1956; and from March 21, 1956 to April 1979. Diagnosed in 1977 with astrocytoma, a type of brain tumor, Joe Carter died on August 8, 1980.

Plaintiff Phyllis Giesler is the widow, and Plaintiffs Harry John Giesler, Jr., Janette Giesler Ormsby, Jeff Giesler, Charles A. Giesler, Victor L. Giesler, Chester L. Giesler, and Nanette B. Giesler, are the surviving children of Harry J. Giesler, decedent (Case No. CV–S–80–380–PMP). Mr. Giesler was born in 1923, and was employed as a miner, shifter, and tunnel walker by REECo at the NTS from August 27, 1958 to October 5, 1962, and from January 10, 1964, to October 31, 1975. In April 1974, Mr. Giesler was diagnosed for transitional cell carcinoma of the bladder, from which he died on August 1, 1976.

Plaintiff Sarah Haynes is the widow, and Plaintiffs Adam Haynes and Beverly Haynes Reeves are the surviving children of Eugene D. Haynes, decedent, (Case No. CV–S–86–385–PMP). Mr. Haynes was born in 1919, and was employed as a security guard at the NTS by Federal Services, Inc., from January

---

1. Until transferred to the undersigned on January 28, 1993, these cases, filed between 1978 and 1986, were assigned to the Honorable Roger D. Foley, Senior United States District Judge, who dedicated years to the supervision of these and related cases arising from nuclear testing activities at the Nevada Test Site. These consolidated cases have twice been the subject of interlocutory appeals before the Ninth Circuit Court of Appeals, as well as Congressional action which resulted in the substitution of the United States as the Defendant in place of the Nevada Test Site contractors by which the various Plaintiffs were employed (see documents ## 123 and 154). On September 19, 1985, *Keith Prescott v. United States of America, et al.*, CV–S–80–143–PMP, was designated as the base file for these consolidated cases (# 163).

24, 1955, to June 10, 1955. Mr. Haynes was diagnosed for lung cancer shortly before his death on April 4, 1985.

Plaintiff Alma Mosley is the widow, and Plaintiffs Jerome Mosley, Leland Mosley and Hugh Mosley are the surviving children of Hugh Mosley, decedent, (Case No. CV–S–80–380–PMP). Mr. Mosley was born in 1916, and was employed as a laborer at the NTS by REECo from December 18, 1952, to September 30, 1953; from November 19, 1954, to November 6, 1957; from May 20, 1958, to June 30, 1959; and from May 9, 1960, to January 25, 1965. Mr. Mosley was diagnosed for adenocarcinoma of the colon in 1978, and died on September 25, 1978.

Plaintiff Keith L. Prescott (CV–S–80–143–PMP) was born in 1926, and began working for REECo at the NTS as a mucking machine and heavy equipment operator from October 26, 1961, to June 19, 1965, and from September 8, 1965, to April 30, 1971. Mr. Prescott was diagnosed for multiple myeloma in 1969, and continues under treatment for that condition.

Plaintiffs Darin Tuck, David Tuck and Brian Tuck are the surviving children of Calvin L. Tuck, decedent, (Case No. CV–S–81–594–PMP). Mr. Tuck was born in 1926, and was employed by REECo at the NTS as a radiation safety monitor from April 30, 1962, to January 5, 1971. In 1972, Mr. Tuck was diagnosed for pancreatic cancer, from which he died on April 3, 1974.

Plaintiffs allege that the cancers suffered by deceased Plaintiffs Carter, Mosley, Haynes, Giesler and Tuck, and the multiple myeloma suffered by Plaintiff Keith L. Prescott, were radiation induced as a result of exposure to ionizing radiation during their employment at the NTS. The specific allegations of government negligence asserted by Plaintiffs are set forth in the Order denying the United States' Motion for Summary Judgment based upon the Discretionary Function Exception of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671–2680, *Prescott v. United States,* 724 F.Supp. 792, 798–99 (D.Nev.1989), *aff'd,* 973 F.2d 696 (9th Cir.1992):

1. Failure to establish or supervise the establishment of adequate procedures to monitor and determine the amount of radiation in a given geographic area or the amount of radiation to which an individual had been exposed.

2. Failure to instruct and advise workmen at the Nevada Test Site as to the possible detrimental health effects of radiation exposure.

3. Failure to provide protective clothing or other apparatus to eliminate, reduce, or minimize the radiation exposure and consequent adverse health effects.

4. Continuing to expose or to allow the exposure of workmen to radiation contamination well knowing or having reason to believe that said continued exposures were actually or potentially unsafe.

5. Failure to take reasonable and necessary precautions in the conduct of the tests which in many instances resulted in unnecessary and undesigned radiation exposure.

6. Failure to advise the individuals exposed to the extent of their exposures and possible detrimental health effects.

7. Failure to properly train, supervise, and inform its employees, agents, contractors, and subcontractors in matters concerning radiation containment and radiation health procedure.

8. Failure to advise workers that because of their exposure to radiation they should have medical check-ups and follow-up medical observations in order to diagnose as early as possible any cancers which might develop.

In response to these allegations, Defendant United States argues first that this Court lacks subject matter jurisdiction over Plaintiffs' claims, because the exposures to radiation which Carter, Giesler, Haynes, Mosley, Prescott and Tuck (hereinafter also referred to collectively as "Plaintiffs") experienced while employed at the NTS, were based on discretionary decisions involving the permissible exercise of policy judgment, thus falling within the "discretionary function" exception to liability for tort provided by 28 U.S.C. § 2680(a).

Second, Defendant maintains that it acted with due care in conducting nuclear testing

at the NTS and that none of the cancers contracted by Plaintiffs was proximately caused by Defendant's negligence or by exposure to ionizing radiation at the NTS.

Third, Defendant contends that the claim of Plaintiff Keith Prescott and the wrongful death claims of the surviving family members of Harry J. Giesler and Calvin L. Tuck are time-barred because their administrative tort claims were not presented to the appropriate federal agency within two years after accrual of their claims as required by 28 U.S.C. § 2401(b).

Fourth, Defendant claims that the surviving family members of Joe Carter and Eugene Haynes cannot recover under the Nevada Wrongful Death Statute because their underlying claims for personal injury were time-barred at the time of their deaths.

Finally, Defendant argues that the wrongful death Plaintiffs cannot recover damages in additional to those authorized under Nev. Rev.Stat. § 41.085(4), or former Nev.Rev. Stat. § 41.090 (1986).

## II.

## THIS COURT'S JURISDICTION AND THE DISCRETIONARY FUNCTION EXCEPTION

The FTCA is a limited waiver of sovereign immunity which authorizes suits against the United States for damages for personal injuries suffered by a private person which are proximately caused by certain torts of federal employees acting within the scope of their employment. See 28 U.S.C. §§ 1346(b), 2674. As the Ninth Circuit Court of Appeals recognized in its Opinion affirming this Court's denial of Defendant's Motion for Summary Judgment, "such a suit is not available, however, when the act or omission complained of is 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on

the part of a federal agency or an employee of the [g]overnment.' 28 U.S.C. § 2680(a)." *Prescott*, 973 F.2d at 698.[2]

■ The law is settled that nuclear tests, and all decisions and planning made in preparation for, conducting, and evaluating such tests, are clearly within the discretionary function exception and thus immune from suit under the FTCA. *Id.* at 702. The discretionary function exception to the FTCA does not, however, immunize every act or omission of government employees in carrying out the nuclear testing program at the NTS. To avail itself of the discretionary function exception, Defendant bears the burden of proving that, to the extent they occurred at all, the acts of negligence alleged by Plaintiffs flowed from choices of the government grounded in political, social or economic policy. *Id.* at 698, 702.

■ In determining whether the discretionary function exception applies to the specific acts of negligence alleged by Plaintiffs, the Court must utilize the two-step test provided by the United States Supreme Court in *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) and *United States v. Gaubert*, 499 U.S. 315, 322–23, 111 S.Ct. 1267, 1273–74, 113 L.Ed.2d 335 (1991). The Court thus considers whether Defendant's alleged acts of negligence were matters of choice or judgment and whether the judgments were grounded in social, economic or political policy. *See also Summers v. United States*, 905 F.2d 1212, 1214 (9th Cir.1990).

The evidence adduced at trial persuades the Court that the specific acts of negligence alleged by Plaintiffs in this case flowed directly from the policy choices of government and on-site NTS officials who had been explicitly entrusted with the responsibility of weighing competing social, economic and political policy considerations. *In re Consolidated United States Atmospheric Testing*

---

**2.** Title 28, United States Code, Section 2680 states:

"The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or

regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

*Litigation,* 820 F.2d 982, 995 (9th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988).

The nuclear testing program giving rise to this litigation arose out of the United States' decision to attempt to develop an atomic bomb during the early years of World War II. In 1939, scientists at Columbia University confirmed the German discovery that uranium atoms could be split releasing explosive energy far more powerful than any then known. In August 1939, alarmed that Germany might develop an atomic weapon, and encouraged by others in the scientific community, Albert Einstein wrote President Franklin Roosevelt urging the entry of the United States into fission research. *See* Defendant's Exhibit 28764.

As the United States entered WWII, President Roosevelt ordered the United States Army to attempt to develop an atomic weapon, and the Manhattan Project was established. In March 1943, the atomic weapons project was initiated at Los Alamos, New Mexico, under the direction of Dr. J. Robert Oppenheimer. On July 16, 1945, the Manhattan Project culminated in the detonation of the first atomic device, named the Trinity event. Three weeks later, the United States military dropped atomic bombs on Hiroshima and Nagasaki, Japan, ending WWII. *See* Defendant's Exhibit 28764.

At this point, the United States held what it recognized to be a temporary monopoly on nuclear weapons. Prompted by the need to understand more fully the strategic, tactical and technical implications of atomic weaponry, a post-war nuclear testing program was initiated by the United States at the direction of President Harry Truman on January 10, 1946. The first nuclear test series, Operation CROSSROADS, involved two tests conducted at the Bikini Atoll in the Marshall Islands. The results of these tests persuaded President Truman and the United States Military that additional nuclear tests were necessary to develop nuclear weapons, and systems for their delivery, as well as to de-velop defense and radiological safety measures for the military and the population of the United States. *See* Defendant's Exhibit 28764.

By 1947, plans were initiated for the development of a continental United States nuclear test site to augment the Marshall Islands Pacific Test Site at Bikini Atoll and Enewetak Atoll. That need became more urgent with the onset of the Korean War in 1950, and in December of that year, President Truman approved the establishment of the Nevada Test Site. *See* Defendant's Exhibit 28765.

Congressional authorization for nuclear weapons testing programs was conferred by the Atomic Energy Act of 1946, 60 Stat. 755, and the Atomic Energy Act of 1954, 68 Stat. 919, codified as amended, at 42 U.S.C. § 2011, et seq. Congress therein declared it to be the policy of the United States that "making the maximum contribution to the common defense and security" of the United States was to be the "paramount objective" in the development, use, and control of atomic energy. 42 U.S.C. § 2011(a). The Atomic Energy Act of 1954 also provided that "[t]he development, utilization and control of atomic energy for military and all other purposes are vital to the common defense and security." 42 U.S.C. § 2012(a).

To implement the nuclear testing program, Congress established the Atomic Energy Commission ("AEC") which coordinated its efforts with the Department of Defense.[3] Among other things, the objectives of the nuclear tests conducted at the NTS under the direction of the AEC included verification of nuclear weapons design and safety tests of the devices, and weapons effects experiments, including efforts to reconstruct radiation doses received by the atomic bomb survivors of Hiroshima and Nagasaki.

Every nuclear test conducted at the NTS, including those at issue in these six representative cases, was the product of a comprehen-

---

3. On October 11, 1974, President Ford signed the Energy Reorganization Act, 88 Stat. 1233, abolishing the AEC, and transferring its nuclear weapons program to the Energy Research & Development Administration ("ERDA"). On Au-gust 4, 1977, President Carter signed the Department of Energy Organization Act, 91 Stat. 565, abolishing ERDA and transferring the nuclear weapons program to the Department of Energy ("DOE").

sive planning process which included test proposals by any of three nuclear weapons laboratories (Los Alamos National Scientific Laboratory, Lawrence Livermore Scientific Laboratory, and Sandia Laboratory), or the Department of Defense. Each proposal required the approval of the AEC and a Committee of the National Security Council consisting of the Secretary of Defense, Secretary of State, and Chairman of the AEC. Furthermore, all nuclear testing series conducted at the NTS received the personal approval of the President of the United States.

Nuclear tests at the NTS were conducted under the direction of a test manager designated by the AEC who was responsible for drafting and implementing plans and orders for each test series, and for issuing a report summarizing the results of the tests. Conducting nuclear tests necessarily entailed the exposure of individuals involved in the testing process to radiation. As a result, permissible levels of radiation exposure of NTS personnel were established by the AEC's Division of Biology and Medicine and its Division of Operational Safety.

In 1951, the permissible level of external gamma radiation dose permissible over a consecutive thirteen-week period was set at 3.9 roentgens.[4] See Defendant's Exhibit 22316. This permissible exposure level remained in effect for all nuclear test series and non-testing periods at the NTS through January 1957, when the level was revised to

3.0 roentgens per thirteen-week period with a yearly limit of 5 roentgens. This revised permissible exposure level remained in effect at the NTS through 1968.

These permissible levels of radiation exposure were the product of extensive analysis by those charged with conducting nuclear tests and clearly involved the weighing and balancing of a number of social, economic and political considerations based on then available scientific and medical data. See Defendant's Exhibits 20280, 20231, 20887, 20843, 39029 and 20918. As was stated in the AEC's memorandum revising permissible levels of radiation exposure of October 9, 1957, "The use of revised NRCP recommended levels as guides in the atomic energy program assures optimum protection of the health of atomic energy workers … from exposure to radiation resulting from AEC activities, consistent with the necessity of conducting production, laboratory, and test operations." See Defendant's Exhibit 20887.

■ The Atomic Energy Act specifically authorized the AEC to promulgate such standards and instructions, "as the Commission may deem necessary and desirable to promote the common defense and security and to protect health or to minimize the danger to life and property." 42 U.S.C. § 2201(b). The Court finds that as a result, the decision of the AEC to authorize the exposure of NTS personnel to radiation within the permissible exposure limits set by the AEC's Division of Biology and Medicine, and Division of Opera-

---

4. Various special units have been developed for use in radiation safety. The "roentgen" (R), the "rad" and the "rem" are the radiation units used to express the quantities of exposure, absorbed dose and dose equivalent, respectively.

In 1928, the ICRU adopted the "roentgen" as the standard measure of x-ray exposure. Although the roentgen subsequently became a common unit for measuring radiation, it is a unit of exposure in air rather than a biological measure of absorbed dose. Nonetheless, the roentgen served as the basic unit of radiation measurement until 1953. Difficulties in applying the roentgen to biological studies eventually led to the establishment of a new quantity and unit. In 1953, the ICRP and the ICRU jointly recommended the use of absorbed dose, and defined a new unit, the "rad". Unlike the roentgen, the rad represents a unit of radiation energy absorbed in matter, and thus could be applied to tissue, air, water, or any other mass. Later, to

account for the fact that different types of radiation (e.g., alpha particles, beta particles, gamma rays), have different degrees of biological effect, these organizations also recommended the use of the dose equivalent and defined another new unit, the "rem." The dose equivalent is an absorbed dose weighted for biological effectiveness; that is, for any type of radiation the dose in rem can be calculated by multiplying the absorbed dose in rad by the quality factor for that particular type of radiation. The rem is a useful unit because a rem of any radiation type should produce the same biological effect as a rem of any other type of radiation. For most of the external gamma (or x-ray) exposures, it can be assumed that 1 R = 1 rad = 1 rem.
See ICRU REPORT 19, Radiation Quantities and Units, (1971), and ICRU REPORT 33, Radiation Quantities and Unit (198), Defendant's Exhibit 28768:

tional Safety, were decisions made at the planning level pursuant to an express delegation of authority by Congress. These decisions are, therefore, protected by the discretionary function exception provided by 28 U.S.C. § 2680(a). *Gaubert,* 499 U.S. at 323, 111 S.Ct. at 1273.

■ A similar exercise of discretion was involved in reaching decisions concerning how best to protect NTS workers against exposure to ionizing radiation in excess of permissible levels. Procedures for monitoring and determining the amount of radiation to which NTS personnel were exposed, including procedures for radiological monitoring and for the use of protective clothing and other apparatuses, were developed under the direction of the AEC and were set forth in operations orders, safety plans, manuals and other directives.[5]

Throughout the nuclear testing activities at the NTS, radiation safety monitors accompanied NTS personnel, including Plaintiffs, into contaminated areas of the NTS to verify compliance with established radiological safety procedures. For example, in 1957, the Test Manager's Standard Operating Procedure for the Nevada Test Organization was adopted and its provisions for radiological safety applied to all tests at the NTS. *See* Defendant's Exhibit 28774. It provided in part:

e. *Operational Guidelines, Radiation Exposures*

(4) All personnel will be issued film badges on entering Mercury. They will be exchanged monthly on a routine basis.

(5) The On–Site Rad–Safety organization will process film badges and submit dosage records to the Test Director and the Support Director on a monthly basis; however, those personnel engaged in operations in contaminated areas will have their badges processed immediately after each recovery. These daily dosage reports will be provided to the Test Director and the Support Director on a daily basis.

(6) The Test Director and Support Director will be notified immediately of an integrated exposure in excess of 2 roentgens.

\*　\*　\*　\*　\*　\*

g. *Entry into contaminated areas*

(2) Recovery missions will be allowed into shot areas in accordance with the radiological situation. The Test Director's schedule of events will be used as a guide in determining the order of priority, based on the radiological situation. The On–Site Rad-safety Organization will set up check stations at appropriate points as required to control traffic into contaminated areas.

h. *Radiation Exposure Control*

(1) Control of Entrances

(b) All personnel cleared for access into full radex areas will enter and exit from the area through a check point which will be established between the Control Point and the contaminated test area.

(2) Monitors

(a) All parties entering full radex areas will be required to have certified monitors accompanying them. These monitors are responsible to the project party leaders.

(c) The On–Site Safety Organization will have training courses for project monitors as required.

(e) It is required that the rad-safe monitors, and any others as directed by the party leader, shall be briefed at the Rad–Safety Building, the Control Point, or at any other place as required by the test Director prior to receipt of an access permit.

(3) Rad–Safety Equipment and Clothing

(b) All necessary rad-safety equipment, including instruments, clothing, respirators, film badges, and dosimeters may be obtained at the Rad–Safety building at the Control Point.

(5) Film Badge Procedure

---

5. *See,* for example, Defendant's Exhibit 20231; Exhibit 28590 regarding Operation TUMBLER–SNAPPER; Exhibit 26749 regarding Operation UPSHOT/KNOTHOLE; Exhibit 20378 regarding Operation TEAPOT, Exhibit 20832 regarding Operation PLUMBBOB, and Exhibit 26467 regarding Operation HARDTACK II.

(a) All personnel within the NTS, exclusive of Desert Rock personnel, will be provided with an address-o-graph plate and a film badge. These will be attached to and worn with the security badge. Official dosage assignment will be based on the results of the processed film.

(6) Decontamination

(b) All persons leaving a full or limited radex area will be monitored for contamination on the person and on equipment. Persons leaving such areas will clear through the Rad–Safety Building at the Control Point.

In addition to protective clothing, and where appropriate, respirators, all NTS personnel were required to wear film badges and pocket dosimeters which were used to measure and control each employee's exposure to radiation. *See* Defendant's Exhibit 38715. Film badges were collected daily so that each individual's radiation exposure could be recorded, and the pocket dosimeters provided a more immediate reading of each individual's exposure while in the field. Rad–Safe monitors accompanied all individuals, including NTS employees, into contaminated areas at the NTS to ensure that they were dressed appropriately and were wearing required film badges and dosimeters. Rad–Safe monitors also monitored the areas where recovery or clean-up work was occurring in an effort to ensure that NTS personnel would not exceed maximum permissible radiation doses while remaining in a radiologically "hot" area for too long a period. Rad–Safe monitors attended a two-week training course prior to work in the field at the NTS where they thereafter received on-the-job training from experienced Rad–Safe personnel.

Plaintiffs' allegations of negligence generally challenge the adequacy of the radiological monitoring and safety procedures at the NTS, and cite three instances in which Plaintiffs suffered radiation exposures over the established permissible limits.[6] Even if this Court were to find that the radiological moni-

toring and safety procedures in place at the NTS during those three exposures were inadequate, and its does not, the discretionary function exception would nonetheless bar Plaintiffs' claims. *Roberts v. United States,* 887 F.2d 899, 901 (9th Cir.1989).

The Court finds that Plaintiffs have failed to present persuasive evidence that Defendant, or others responsible for establishing and maintaining radiological safety procedures at the NTS, failed to do so. Indeed, the evidence presented at trial persuades the Court that procedures for the radiological monitoring and protection of NTS workers to guard against radiation exposures in excess of the established permissible limits were in place and were followed throughout the time frames during which Plaintiffs were employed at the NTS.

■ The Court also finds that decisions made by NTS officials regarding what information to give to NTS employees concerning the possible detrimental health effects of radiation and the extent of their radiation exposures, as well as recommendations regarding medical checkups, were grounded in the policy underlying the nuclear testing program and thereby fall within the discretionary function exception.

The AEC established a policy for informing NTS employees of their radiation exposures as early as 1952. *See* Defendant's Exhibits 20231, 23448 and 26405. The policy analysis underlying the disclosure decisions is illustrated in the Report of the Director of Biology and Medicine to the General Manager of the Atomic Energy Commission dated April 29, 1958, which provided in part:

a. A uniform policy of informing AEC and AEC contractor employees of their record of occupational radiation exposure dose is desirable.

b. The AEC should endorse and encourage the practice, common with AEC contractors generally, of providing the employee with information on his radiation exposures below those levels specified in uniform practices to the extent that such

---

**6.** The accumulated exposures to Joseph Carter of 4.330 roentgens in April 1953, and 4.3 roentgens on January 18, 1956, and the 39.0 roentgens exposure of Eugene Haynes on March 1, 1955. *See* Defendant's Exhibits 38990, 20670 and 26351.

information may be useful in minimizing the occupational radiation exposure of the employee.

c. Requirements for information an employee of his recorded occupational radiation exposure accumulated as a result of his employment should include the following:

(1) Tell the employee at his request of radiation exposure information recorded for him.

(2) Routinely inform him each year of his accumulated dose from penetrating radiation for the previous year if his permissible exposure was exceeded.

(3) Notify the employee when it is determined that his permissible quarterly, yearly, or internal dose has been exceeded.

(4) Provide the terminating employee at his request a written summary of his accumulated radiation dose recorded during his employment.

The foregoing policy was adopted by the General Manager of the AEC. *See* Defendant's Exhibits 26789 and 30946. As reflected the Radiation Exposure History cards signed by Keith Prescott (Defendant's Exhibit 40482), Calvin Tuck (Defendant's Exhibit 40481), Hugh Mosley (Defendant's Exhibit 40483), Harry Giesler (Defendant's Exhibit 40484), and Joe Carter (Defendant's Exhibit 40485), each was advised of the availability of information relating to their radiation exposures.

In sum, and as discussed *infra*, Plaintiffs have generally failed to prove the eight specific acts of negligence attributed to Defendant. To the extent Plaintiffs have presented evidence bearing upon any of the specific acts of negligence alleged, however, the Court finds that Defendant has met its burden of demonstrating that its actions flowed directly from the policy choices of on-site NTS officials who had been explicitly entrusted with the responsibility of balancing competing political, economic and social considerations. The Court, therefore, concludes that the discretionary function exception to the FTCA provided by 28 U.S.C. § 2680(a), effectively bars Plaintiffs' claims against Defendant and this Court lacks subject matter

jurisdiction under the FTCA. *Prescott,* 973 F.2d at 703.

## III.

### PLAINTIFFS' NEGLIGENCE CLAIMS

Under the FTCA, Plaintiffs' eight claims of negligence against Defendant must be determined in accordance with the law of the place where the allegedly negligent acts or omissions occurred. 28 U.S.C. § 1346(b); *Smith v. United States,* —— U.S. ——, —— – ——, 113 S.Ct. 1178, 1181–82, 122 L.Ed.2d 548 (1993); *Littlefield v. United States,* 927 F.2d 1099, 1102 (9th Cir.1991). To prevail on a claim of negligence, the law of the State of Nevada generally requires that the Plaintiff show: "(1) the defendant had a duty to exercise due care toward the plaintiff; (2) the defendant breached that duty; (3) the breach was an actual cause of plaintiff's injuries; (4) the breach was the proximate cause of the injury; and (5) the plaintiff suffered damages." *Perez v. Las Vegas Medical Center,* 107 Nev. 1, 805 P.2d 589, 591 (1991).

In Orders entered November 22, 1993, (# 437) and January 12, 1994 (# 482), this Court ruled that the actions brought by the surviving spouses and children of Joe Carter, Harry Giesler, Eugene Haynes, Hugh Mosley and Calvin Tuck, were wrongful death actions and that the wrongful death Plaintiffs could not invoke the statutory presumptions of negligence under the Nevada Insurance Industrial Act ("NIIA"), Nev.Rev.Stat. § 616.375, and the Nevada Occupational Diseases Act ("NODA"), Nev.Rev.Stat. § 617.-275. As a result, the wrongful death Plaintiffs are required to prove their claims of negligence in accordance with the standards announced in *Perez,* without reliance on the burden shifting presumption provided by NODA.

In the same Orders (# 437 and # 482), this Court ruled that the NODA presumptions of negligence accorded former employees, such as Keith Prescott by Nev.Rev. Stat. § 617.275, applied only to radiation exposures which occurred after the July 1, 1963, effective date of the 1963 amendments to NODA which removed the exclusion of

employees of the AEC or any of its contractors. Prior to that date, radiation-induced occupational diseases contracted by AEC and AEC contractor employees were not compensable under the Nevada Occupational Diseases Act, and neither the AEC nor its contractors were required to provide NODA insurance coverage for such diseases.

█ Therefore, to the extent Plaintiff Keith Prescott claims injury and damages as a result of exposure to ionizing radiation prior to July 1, 1963, he must meet the same standards of proof of negligence which apply to the wrongful death co-plaintiffs. To the extent Plaintiff Prescott seeks recovery for his multiple myeloma caused by exposure to ionizing radiation at the NTS after July 1, 1963, he must prove by a preponderance of the evidence that his cancer arose out of his exposure to ionizing radiation during his employment by Defendant. *Richard Matthews, Jr., Inc. v. Vaughn,* 91 Nev. 583, 540 P.2d 1062, 1064 (1975). An occupational disease arises out of and in the course of employment if there is a direct causal connection between the conditions under which the work is performed and the occupational disease. Nev. Rev.Stat. § 617.440. Upon making that threshold showing, a defendant is then required to rebut the statutory presumption of negligence provided by Nev.Rev.Stat. § 617.-275, by showing by a preponderance of the evidence that it exercised due care. Thus, to rebut the presumption of negligence, Defendant herein would be required to show that it exercised the standard of care that a reasonable, prudent person would exercise under the same circumstances. *Sherburne v. Miller,* 94 Nev. 585, 583 P.2d 1090 (1978).

## A

### DUE CARE

█ A fundamental component of Plaintiffs' claims of negligence requires that Plaintiffs prove that Defendant failed to exercise due care in permitting Plaintiffs to be exposed to ionizing radiation while employed at the NTS. The Court finds that Plaintiffs have failed to meet this burden.

In addressing the applicability of the discretionary function exception to the FTCA, this Court has already made extensive findings regarding the precautions taken by Defendant to establish adequate procedures to monitor and protect against impermissible radiation exposures to NTS personnel, and to train NTS personnel concerning radiation containment and radiation health procedures. These findings do more than support the application of the discretionary function exception in this case. They also lead this Court to the conclusion that with regard to the exposure of Plaintiffs to ionizing radiation while employed at the NTS, Defendant exercised the standard of care that a reasonable, prudent person would exercise under the same circumstances. *Sherburne,* 94 Nev. at 590, 583 P.2d 1090.

Plaintiffs' health physics expert, Dr. Karl Z. Morgan, acknowledged as much during his testimony when he stated that his evaluation of NTS safety practices was based upon the standards adhered to today, and that his own conduct with regard to radiation experimentation in the early 1940's, should not be judged by today's standards. Dr. Morgan's testimony recognizes the obvious. It is generally inappropriate to judge the radiological safety precautions taken thirty to forty years ago, by scientific and medical standards known and adhered to today. Nonetheless, the Court finds that even if the radiological safety standards followed by Defendant at the NTS during the 1950's, 1960's and 1970's were evaluated by today's standards, the results as to Plaintiffs in this case would be the same.

Predictably, Plaintiffs and Defendant disagree as to the precise dose of radiation to which Plaintiffs were exposed while employed at the NTS. The Court finds, however, that the expert testimony provided by Defendant regarding this issue is far more complete and credible than that provided by Plaintiffs, and it thus far more persuasive.

There are basically two types of external radiation exposure from nuclear detonations, initial and residual. Initial radiation is that which occurs within the first minute of a nuclear detonation. There is no evidence that initial radiation affected any of the Plaintiffs in this case. Residual radiation is that which occurs for a long period of time

after a nuclear detonation, and is the type of radiation at issue in this case. Residual radiation consists principally of alpha particles, beta particles, and gamma rays. Because gamma radiation is the only type of residual external radiation capable of penetrating the body to the depth of internal organs, all employees at the NTS, including Plaintiffs, were required to wear film badges to measure the dose of gamma radiation they received throughout each day.

Plaintiffs and Defendant's experts essentially agree on their analysis of the available film badge data which reflects the external gamma radiation doses received by Plaintiffs in this case. *See* Plaintiffs' Exhibit 279 and Defendant's Exhibit 3911. Determining the external dose of gamma radiation reflected on film badges worn by Plaintiffs at the NTS is, however, only part of the analysis regarding the biological effects of radiation exposure. The second step is to convert the film badge readings reflecting external gamma radiation, to deep-dose equivalents to the internal organs of the body. The difference between the film badge readings which record external radiation exposure and the deep-dose equivalents accounts for the attenuation of the gamma radiation as it passes through body tissues to the internal organs in question. Plaintiffs' evidence largely fails to consider these deep-dose equivalents. However, Defendant's evidence in this regard is persuasive in demonstrating that the radiation exposure received by Carter, Giesler, Haynes, Mosley, Prescott and Tuck which could be considered as having any biological effect in relation to their cancers, is significantly less than that estimated by Plaintiffs.

Plaintiffs also claim that internal exposure to radioactive particles may have contributed to their cancers. The Court, however, finds that the evidence relating to internal exposure to radioactive particles by inhalation or swallowing fails to show that any of the Plaintiffs experienced more than minimal internal radiation exposure.

With regard to atmospheric testing at the NTS, the overwhelming percentage of radioactive particle fallout in the areas in which any of the Plaintiffs were located was too large to inhale or swallow. Second, NTS employees, including Plaintiffs, wore respiratory protection equipment, generally in the form of respirators, to protect against inhalation of radioactive particles. Third, water trucks sprayed the cleanup areas at the NTS to reduce dust which could transmit radioactive particles into the body through the nose or mouth.

The risk of internal exposure to those working underground at the NTS was also reduced by the fact that most of the NTS tunnels were naturally wet, thereby reducing dust containing radioactive materials. Where the tunnels were not wet, they were sprayed with water to reduce dust. Additionally, an adhesive sealant was sprayed on the walls and ceilings of the tunnels to reduce airborne contamination, and the floors of the tunnels were generally covered with clean sand and gravel. Finally, each tunnel was equipped with a ventilation system to reduce airborne contaminants.

In sum, the Court finds that the only calculable source of radiation exposure to Carter, Giesler, Haynes, Mosley, Prescott and Tuck at the NTS was that received from residual external gamma radiation. Although this Court finds Defendant's calculations as to the extent of that radiation exposure to be far more persuasive than those presented by Plaintiffs, the distinction between them becomes less significant in light of this Court's findings and conclusions that none of the estimated radiation exposures provided by the parties was a substantially contributing factor in causing the cancers at issue.

### B

### *CAUSATION*

Even if the Court were to find that Defendant had breached its duty of due care in exposing employees at the NTS in general, and Carter, Giesler, Haynes, Mosley, Prescott and Tuck in particular, to ionizing radiation as alleged, Plaintiffs' negligence claims would still fail because Plaintiffs have failed to prove by a preponderance of the evidence that the radiation exposures in question were a substantially contributing factor in causing

the cancers they developed. *Perez,* 805 P.2d at 591; *Prabhu v. Levine,* 109 Nev. 607, 855 P.2d 543, 548 (1993).

Although Dr. Edward Radford, one of Plaintiffs' causation experts, testified that occupational radiation exposure was, in his opinion, a contributing cause of the cancers suffered by Carter, Giesler, Haynes, Mosley, Prescott and Tuck, he also testified that he did not know the extent to which the occupational exposures to ionizing radiation experienced by Plaintiffs at the NTS, contributed to the induction of the particular cancers they developed.

Moreover, the testimony of Plaintiffs' other causation expert, Dr. John Grayson, was entirely inadequate to demonstrate causation. Dr. Grayson acknowledged that he had no basis for his testimony that radiation exposures are "causative" or "contributory" to the induction of solid tumor cancer. Instead, Dr. Grayson relied on his view that there generally exists an association between radiation exposure and the induction of cancer without regard to radiation dose, alternative causative factors, or latency periods.

Additionally, the Court gives little weight to Dr. Radford's testimony because it was based upon an incorrect assumption regarding the doses of radiation to which Keith Prescott, Joe Carter, Harry Giesler, Eugene Haynes, Hugh Mosley and Calvin Tuck were exposed. Plaintiffs' dosimetry expert, Dr. Roland Finston, who testified after Dr. Radford, presented his expert opinion that Plaintiffs were exposed to doses of radiation substantially below those that Dr. Radford was asked to assume during his testimony regarding causation. The parties stipulated that if Dr. Radford were recalled to testify, his opinions regarding the causative connection between the cancers developed by Plaintiffs and radiation exposure would remain unchanged even in light of reduced doses calculated by Dr. Finston. Those reduced dose calculations provided by Dr. Finston are tenuous at best, however, in light of Dr. Finston's concession on cross examination that his dose calculations were also too high.

In sum, Plaintiffs' expert testimony and evidence regarding causation, even if accepted fully, if insufficient to support a finding

that radiation exposure at the NTS was a substantially contributing factor in causing the cancers developed by Prescott, Carter, Giesler, Haynes, Mosley and Tuck. *Prabhu,* 855 P.2d at 548.

Further, in response to the evidence offered by Plaintiffs on the issue of causation, Defendant marshalled substantial evidence which persuades the Court that the radiation exposures experienced by Prescott, Carter, Giesler, Haynes, Mosley and Tuck while employed at the NTS, cannot fairly be characterized as substantially contributing factors in the cancers they developed.

### 1. JOE CARTER'S ASTROCYTOMA

■ In 1977, Joe Carter was diagnosed with an astrocytoma, from which he died in 1980. According to the uncontroverted testimony of Dr. Robert Anderson, Defendant's expert pathologist specializing in radiation injury, an astrocytoma is the "predominant" malignant primary brain tumor among adults. Data published by the National Cancer Institute in 1992, indicates that the probability that a person will eventually develop "brain and other nervous system" cancer is 0.64% for males of all races and 0.29% for black males. *See* Defendant's Exhibit 38197. According to Dr. Anderson, the cause of primary brain tumors in adults is generally unknown. However, none of the exhaustive scientific studies presented by the parties at trial reveals a relationship between radiation exposure and adult brain tumors in general, or astrocytomas in particular.

During the course of his employment as a laborer at the NTS, Mr. Carter was exposed to a total radiation dose of approximately 18.46 rem. The most comprehensive and authoritative studies of the relationship between radiation exposure and primary brain malignancies derives from studies of atomic bomb survivors from Hiroshima and Nagasaki. These studies show no causal relationship and no increase in the incidence of primary brain tumors among adults exposed to radiation in the realm of that received by Mr. Carter. *See* Plaintiffs' Exhibit 232, and Defendant's Exhibits 37799, 38099 and 38118. Other studies of irradiated adults generally report no connection between radiation expo-

sure and primary brain tumors. Indeed, the only evidence tending to demonstrate any relationship at all between radiation exposure and primary brain tumors are those relating to children of less than 10 years of age who received cranial radiation. This phenomenon is attributed to the fact that brain cells are dividing and renewing in young children, thereby allowing a primary brain tumor to develop after radiation effects a potentially malignant transformation of a cell in brain tissue. *See* Defendant's Exhibit 37799. Such factors are not relevant in the case of an adult such as Mr. Carter.

Given the lack of evidence of a relationship between the less than 19 rem cumulative radiation exposure experienced by Mr. Carter while employed at the NTS, and astrocytomas in adults, the Court finds that the radiation to which Mr. Carter was exposed at the NTS did not cause or substantially contribute to his death.

## 2. HARRY GIESLER'S BLADDER CANCER

■■■ Harry Giesler commenced his employment at the NTS as a miner, shifter, and tunnel walker in August 1958. During the relevant times of his employment at the NTS, Mr. Giesler was, according to the testimony of Plaintiffs' expert, Dr. Finston, exposed to approximately 16.8 rem, and according to Defendant's experts, approximately 7 rem. Testimony at trial also established that Mr. Giesler had previously worked as a uranium miner in Colorado and that he smoked in excess of one pack of cigarettes per day for many years, resulting in chronic obstructive airway disease and emphysema. Mr. Giesler was diagnosed for transitional cell carcinoma of the bladder on April 19, 1984, and died in August 1986. According to the National Cancer Institute, the probability that a person will eventually develop bladder cancer is 3.30% for males of all races and 3.65% for white males. *See* Defendant's Exhibit 38197.

Although high doses of radiation, typically in the hundreds of rem, have been associated with an increased risk of bladder cancer, studies of atomic bomb survivors and ankylosing spondylitics, shows no significant excesses were observed at doses of less than 50

rem and 145 rem, respectively. *See* Defendant's Exhibits 38242, 38099 and 37920. By comparison, epidemiologic investigations of bladder cancer demonstrate a "consistent association between the amount and duration of cigarette smoking and the development of bladder cancer." *See* Defendant's Exhibit 38227. Indeed, studies by the Surgeon General, Centers for Disease Control, and American Cancer Society indicate that smoking raises a male's risk of bladder cancer by 190% over the risk of a male non-smoker. *See* Defendant's Exhibit 37945.

According to the testimony of Dr. Robert Anderson, low-level radiation is not listed among the several occupational risk factors that have been identified for bladder cancer, and when compared to other risk factors for bladder cancer, radiation "would rank toward the bottom." *See* Defendant's Exhibit 38227. Additionally, studies of atomic bomb survivors who received their radiation exposures in a single dose, show a latency period in the development of bladder cancers of from 21 to 25 years after exposure. *See* Defendant's Exhibit 38099. According to Dr. Anderson, since only 16 years elapsed between the date of Mr. Giesler's first exposure to radiation at the NTS in 1958, and his bladder cancer diagnosis in 1974, the latency period for Mr. Giesler is inconsistent with radiation-induced bladder cancer, particularly because Mr. Giesler's radiation exposure was fractionalized over many years rather than the result of a single exposure in 1958.

The Court finds that given a dose of approximately 16.8 rem incurred over several years of exposure, the short latency period between Mr. Giesler's first radiation exposure at the NTS and the diagnosis of his bladder cancer, and Mr. Giesler's long-term exposure to cigarette smoke, Mr. Giesler's exposure to radiation at the NTS did not cause or substantially contribute to his death due to bladder cancer.

## 3. PLAINTIFF EUGENE HAYNES' LUNG CANCER

■■■ Eugene Haynes was diagnosed for lung cancer in March 1985 and died shortly thereafter. During Mr. Haynes' employment at the NTS as a security guard from January

24, 1955, to June 10, 1995, Mr. Haynes received a single dose exposure of 39 rem.

It is undisputed that lung cancer is the chief cause of cancer death in the United States. Data reported by the National Cancer Institute indicates that the probability at birth that a male will develop lung cancer is 8.58%. *See* Defendant's Exhibit 38197. Voluminous medical studies suggest that the risk of lung cancer is far greater where a person has a significant history of smoking. For example, according to the 1989 Report of the Surgeon General, in 1985, the same year Mr. Haynes died from lung cancer, smoking accounted for 87% of lung cancer deaths in the United States. *See* Defendant's Exhibit 38123. The 1992 Report of the Surgeon General indicates that lung cancer deaths among males attributable to smoking is actually 92%. *See* Defendant's Exhibit 38124. Lung cancer risk among smokers is greatest for individuals who, like Mr. Haynes, began smoking at an early age and smoked heavily for many years. *See* Defendant's Exhibit 38123. According to the consultation report of Dr. R. Gagliano, who diagnosed Mr. Haynes' lung cancer in March 1985, Mr. Haynes gave a history of smoking 1.5 packs of cigarettes per day from age 18 until he quit in approximately 1982, thereby accumulating approximately 66–pack years of exposure to cigarette smoke during the course of 45 years of heavy smoking. *See* Defendant's Exhibit 38247.

The Court finds that the probability that Mr. Haynes' lung cancer was induced by cigarette smoking is far greater than the probability that it was induced by a single radiation dose of 39 rem. Recent data regarding atomic bomb survivors attribute 11.4% of the lung cancers among exposed males to radiation exposure, while the other 88.6% were deemed to be background lung cancers which would have occurred even in the absence of atomic bomb radiation. *See* Defendant's Exhibits 38118 and 38242. Further, the atomic bomb survivors were exposed to a far greater single dose of radiation than was Mr. Haynes. Dr. Fred Metler and Dr. David Hoel offered their opinions regarding the probability that Mr. Haynes' lung cancer was caused by smoking as compared to radiation exposure at the NTS, and ultimately concluded that the probability that radiation exposure at the NTS caused Mr. Haynes' lung cancer to be no more than 5%.

Regardless of the quantifiable percentage of probability attributed to radiation exposure as a cause of Mr. Haynes' lung cancer, the evidence persuades this Court that it is far more likely than not that the lung cancer suffered by Mr. Haynes was induced by cigarette smoking and not by the 39 rem exposure he experienced while employed at the NTS. As a result, this Court finds that Mr. Haynes' exposure to radiation while employed at the NTS was not a cause or substantial contributing factor to his lung cancer or subsequent death.

**4. HUGH MOSLEY'S COLON CANCER**

In 1978, Mr. Hugh Mosley was diagnosed for adenocarcinoma of the colon from which he died later that year. During the period of his employment as a laborer at the NTS from 1952 through 1965, Mr. Mosley accumulated a radiation dose of 8.4 rem.

The evidence adduced at trial shows that cancer of the colon, or large bowel, is one of the most common forms of cancer in the United States, affecting about one person in twenty, and is the second most common cause of cancer mortality in this country. *See* Defendant's Exhibits 38294 and 38197. Data reported by the National Cancer Institute in 1992 reflects a "colorectal cancer" rate at 6.19% for all males and at 4.19% for black males. National and international studies reveal a clear association between colorectal cancers and diet. Indeed, populations whose diet is rich in animal fats and meat and poor in fiber, such as those experienced by most Americans, are recognized as presenting a high risk factor for colon cancer. *See* Defendant's Exhibits 38294 and 38197.

Testimony presented at trial indicated that Mr. Mosley enjoyed a typical American diet which was high in cholesterol and low in fiber. Additionally, Mr. Mosley's gall bladder had been removed in 1956 which, according to the testimony of Dr. Philip Schein, an oncologist called by Defendant, compounded his risk of developing a diet-related colon cancer. *See* Defendant's Exhibit 38294.

By comparison, the weight of the evidence presented indicates that exposure to radiation is generally not considered to be a risk factor for colon cancer. In the opinion of Dr. Schein, the radiation exposure experienced by Mr. Mosley during the course of his employment at the NTS could not be considered a causative factor for his colon cancer. Indeed, the studies of atomic bomb survivors indicates no excess of colon cancers among persons receiving less than 50 rem. *See* Defendant's Exhibit 38099.

The Court finds that considering the relatively small dose of radiation experienced by Mr. Mosley during the course of his employment at the NTS, the fact that that exposure was spread over a number of years of employment, and his dietary and medical history, Mr. Mosley's colon cancer cannot be attributed to exposure to radiation at NTS.

### 5. KEITH PRESCOTT'S MULTIPLE MYELOMA

In 1969, Keith Prescott was diagnosed with multiple myeloma, and continues under treatment for that condition. Mr. Prescott was employed at the NTS as a mucking machine and heavy equipment operator between the period 1961 and 1971. During his employment at the NTS, he received a cumulative radiation dose to the bone marrow of between 5.9 rem, according to Defendant's experts, and 13.5 rem according to Plaintiffs' experts.

Dr. Robert Anderson testified that multiple myeloma is a malignant and proliferative cancer involving the B-cells of plasma. It generally begins with lesions of bone marrow which are comprised of plasma cells. *See* Defendant's Exhibit 38074. Data published by the National Cancer Institute shows that the probability that a person will eventually develop multiple myeloma is 0.56% for males of all races and 0.55% for white males. The testimony of Dr. Robert Anderson, Dr. Thomas Mack, Dr. Fred Metler and Dr. David Hoel, all expert witnesses called on behalf of Defendant, express the opinion that there is no demonstrable link between radiation exposure and the induction of multiple myeloma. Their testimony is bolstered by the clear weight of authority provided in numerous medical studies offered into evi-

dence by Defendant. *See* Defendant's Exhibits 37799, 39119, 38074, 38244, 37678, 38041, 38242 and 37991.

The evidence adduced at trial also indicates strongly that Mr. Prescott's multiple myeloma could not be radiation induced as a result of exposures while employed at the NTS due to the latency period required for its development. Mr. Prescott was only employed at the NTS for a period of eight years prior to the diagnosis for myeloma in 1969. According to Dr. Anderson, and numerous medical epidemiological studies introduced into evidence, the latency period for the onset of multiple myeloma appears to be at least 20 years or more after exposure. *See* Defendant's Exhibits 37988, 38099, 38074 and 37799. Even Plaintiffs' expert, Dr. Edward Radford, acknowledges a latency period of approximately 20 years for multiple myeloma. *See* The Beir V Report, Plaintiffs' Exhibit 232.

In sum, although there is medical evidence tending to show a connection between multiple myeloma and certain occupations, such as farming, metal mining and sawmill work, which are all areas of employment in which Mr. Prescott engaged prior to his employment at the NTS, there is no demonstrable link between multiple myeloma and exposure to radiation such as that experienced by Mr. Prescott and the NTS. Moreover, even if multiple myeloma were determined to be a disease which can be induced by radiation, the latency period for Mr. Prescott's multiple myeloma suggests strongly that it could not be the result of radiation exposure during his employment at the NTS. Therefore, this Court finds that Mr. Prescott's exposure to radiation when employed at the NTS did not cause or substantially contribute to his multiple myeloma.

### 6. CALVIN TUCK'S PANCREATIC CANCER

In 1972, Calvin Tuck was diagnosed with pancreatic cancer from which he died on April 3, 1974. From April 30, 1962 to January 5, 1971, Mr. Tuck was employed at the NTS as a radiation safety monitor. During his employment at the NTS, he experienced

a cumulative radiation exposure of approximately 5.4 rem.

Cancer of the pancreas is the fourth largest cause of death due to cancer among adults in the United States. *See* Defendant's Exhibit 38224. Data published by the National Cancer Institute indicates that the probability that a person will eventually develop pancreatic cancer is 1.18% for males of all races and 1.17% for white males. *See* Defendant's Exhibit 38197. Although the cause of pancreatic cancer is not known, an increased risk of cancer of the pancreas has been associated with cigarette smoking, diabetes, and diet, including the consumption of alcohol. *See* Defendant's Exhibit 38224. Dr. Philip Schein, an oncologist called by Defendant to testify regarding digestive cancers, attributed Mr. Tuck's pancreatic cancer to the fact that he smoked two packs of cigarettes per day for many years and had a history of high alcohol consumption. The testimony of Dr. Robert Anderson and Dr. Thomas Mack corroborated the opinion of Dr. Schein regarding Mr. Tuck's risk factors.

By comparison, the evidence adduced at trial demonstrates that exposure to radiation is not known to cause cancer of the pancreas. Notwithstanding the fact that most atomic bomb survivors received radiation doses far greater than that experienced by Mr. Tuck during his employment at the NTS, there is no evidence of increased incidence of pancreatic cancer among the atomic bomb survivors. The same holds true for patients treated by radiation for ankylosing spondylitis and cervical cancer. *See* Defendant's Exhibit 39118, 37799, 38242, 38099, 38118, 37708, 37920, 27969 and 37687. Indeed, these conclusions are strongly supported by the result of the Beir V studies introduced by Plaintiffs. *See* Plaintiffs' Exhibit 232.

Additionally, given the minimum latency period of at least 15 years for radiation-induced solid tumors, it is highly unlikely that Mr. Tuck's exposure to radiation over the length of his employment at the NTS could be a cause of his pancreatic cancer. *See* Defendant's Exhibit 38099.

Therefore, the absence of evidence that pancreatic cancer can be induced by radiation exposure, particularly at the low levels

experienced by Mr. Tuck, and the latency period factor, combined with the presence of two major risk factors which are more likely the cause of the pancreatic cancer Mr. Tuck experienced, leads this Court to the finding that Mr. Tuck's exposure to radiation while employed at the NTS did not cause or substantially contribute to his pancreatic cancer or his death.

## C

### SUMMARY REGARDING CAUSATION AND DUE CARE

The Court finds that Plaintiffs have failed to prove by a preponderance of the evidence, AND TO A REASONABLE DEGREE OF MEDICAL PROBABILITY, that the radiation exposures experienced by Keith Prescott, Joe Carter, Harry Giesler, Eugene Haynes, Hugh Mosley and Calvin Tuck were a substantial contributing factor in causing their cancers. This Court also finds that a preponderance of the evidence adduced at trial demonstrates that Defendant exercised due care with respect to the NTS employees, including Plaintiffs, in protecting them from exposure to harmful doses of radiation at the NTS. As a result, this Court concludes that Defendant is entitled to entry of judgment on the dispositive issue of negligence. *Prabhu,* 855 P.2d at 548; *Perez,* 805 P.2d at 591.

## IV.

### STATUTE OF LIMITATIONS

The Court has concluded that Plaintiffs have failed to prove their negligence claims, and that to the extent they may be deemed to have done so, their claims are barred by the discretionary function exception to the FTCA. 28 U.S.C. § 2680(a). As a result, the Court finds it unnecessary to address Defendant's arguments that the wrongful death claims of the Giesler and Tuck Plaintiffs and the personal injury claim of Plaintiff Prescott, are time-barred by the two-year statute of limitations for FTCA claims under 28 U.S.C. § 2401(b). The Court similarly finds it unnecessary to consider Defendant's argument that the wrongful death claims of the Carter and Haynes Plaintiffs are barred

by the "condition precedent rule" because their personal injury claims were allegedly time-barred at the time of their deaths.

## V.

## CONCLUSION

Throughout this litigation, counsel for the parties have cited the Court to an array of cases involving alleged injuries resulting from nuclear testing. Some of these, of course, provide useful guidance regarding issues arising in these consolidated cases. None, however, are dispositive of the claims presented by Plaintiffs. This is not a case about whether radioactive fallout from atmospheric nuclear tests caused injury, including leukemia or other cancers, to unwitting citizens living downwind of the NTS; or whether NTS and other government officials negligently failed to warn of potential danger from that fallout. Neither is this a case about whether military personnel were knowingly exposed to allegedly hazardous doses of radiation during military exercises held in conjunction with nuclear tests at the NTS. And this is not a case about human radiation experiments allegedly conducted under the auspices of the DOE and its predecessor, the AEC, on either fully informed or uninformed subjects. Certainly such allegations engender strong moral, political, and where proved in court, legal responses—and they should. As the subjects of lawsuits, however, these are cases which must be addressed fairly in the context of relevant evidence and applicable law.

This case is about a variety of people who went to work at the NTS as laborers, miners, equipment operators, radiation safety monitors, and in a host of other jobs at a time when this nation's nuclear testing program was at its zenith. Those who accepted employment at the NTS knew they were engaged in a massive nuclear testing program, many aspects of which were shrouded in official government secrecy. Indeed, each person so employed was required to hold a high level security clearance before they could set foot in restricted areas of the NTS. Each NTS worker realized that they would be exposed to varying degrees of ionizing radiation. Radiation poses a different kind of occupational hazard than a collapsing tunnel, or heavy equipment gone awry. Radiation is invisible and its effects are in a great many respects not understood, or worse, misunderstood. Just as each NTS employee, including Plaintiffs, took occupational safety precautions to protect themselves and co-workers from potential dangers involving the operation of heavy equipment in construction, mining and other hazardous work, however, they and those supervising them abided by precautions designed to minimize risks associated with radiation exposure.

Thousands worked at the NTS throughout the lengthy series of nuclear testing programs at issue in this case, and a great percentage of those workers were exposed to varying doses of ionizing radiation. Some of those workers, including Plaintiffs, developed various forms of cancer. Many have died from this horrible disease, and these workers, their families and friends have suffered mightily. It is doubtful that any courtroom filled to the ceiling with evidence, or the testimony of one hundred experts, or the arguments of dozens of attorneys, let alone the findings of any judge, will persuade any of the afflicted NTS workers or their families that the link between their radiation exposures while employed at the NTS and their cancers is not evident. For them, the connection is clear and that is understandable. Perhaps it is all the more understandable in light of the official secrecy which for a variety of reasons surrounded the nuclear testing programs at the NTS, as secrecy by the government often breeds mistrust.

Nonetheless, the issue which must be confronted in this litigation, is not, and cannot be, whether a sense of sympathy requires that monetary damages be awarded because Plaintiffs and other NTS workers who were exposed to radiation at the NTS now suffer from or have even died from cancer. As with every case which comes before a court for trial, the question of liability for an injury must be decided on the evidence and the law applicable to that case. The unavoidable issue before this Court is, therefore, whether the evidence demonstrates the necessary causal relationship between the exposures to radiation experienced by the individual Plain-

tiffs and the cancers they suffered. The Court concludes that necessary causal relationship has not been established by the evidence presented, and that this Court lacks subject matter jurisdiction under the discretionary function exception to the FTCA.

Based upon the foregoing Findings of Fact and Conclusions of Law, the Court, therefore, enters Judgment in favor of Defendant United States and against Plaintiffs Keith Prescott (CV–S–80–143–PMP (LRL)), Joe Carter (CV–S–81–594–PMP (LRL)), Harry Giesler (CV–S–80–380–PMP (LRL)), Eugene Haynes (CV–S–86–385–PMP (LRL)), Hugh Mosley (CV–S–80–380–PMP (LRL)) and Calvin Tuck (CV–S–81–594–PMP (LRL)).